

NUMBER 13-09-00706-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

FERNANDO OTERO, M.D., MCALLEN
HOSPITALS, L.P. D/B/A EDINBURG
REGIONAL MEDICAL CENTER,
AND RAMIRO LEAL, M.D.,                                          Appellants,

v.

FARIDE LEON A/K/A FARIDE CARMONA
AS NEXT FRIEND OF DANIELA CARMONA,
A MINOR CHILD,                                                 Appellee.

## On appeal from 332nd District Court
## of Hidalgo County, Texas.

# OPINION

**Before Justices Rodriguez, Benavides, and Vela**
**Opinion by Justice Rodriguez**

Appellants Fernando Otero, M.D., McAllen Hospitals, L.P. d/b/a Edinburg Regional Medical Center (McAllen Hospitals), and Ramiro Leal, M.D. challenge the trial court's denial of their motions to dismiss appellee Faride Leon's[1] health care liability claim filed on behalf of her daughter for failure file an adequate expert report as required by section 74.351.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b) (Vernon Supp. 2009). Each appellant filed a brief.  By two issues, Dr. Otero argues that the trial court erred in failing to (1) dismiss Leon's claims because her expert report did not identify the applicable standard of care or explain the causal connection between the alleged breach and Leon's injury, and (2) award him attorneys' fees.  By one issue, McAllen Hospitals argues that the trial court erred in denying its motion to dismiss because Leon's expert report did not identify the applicable standard of care, state the manner in which the standard was breached, or explain causation.  By two issues, Dr. Leal (1) complains that Leon failed to timely serve her expert report on him, and (2) challenges the causation element of Leon's expert report.  We affirm.

## I. BACKGROUND

This case involves alleged injuries incurred by Leon's daughter, Daniela Carmona, during her delivery at McAllen Hospitals's Edinburg Regional Medical Center (Edinburg Regional).  Dr. Leal was Leon's obstetrician during her prenatal period; Dr. Otero performed the delivery of Daniela.  Leon filed suit on behalf of Daniela in connection with the treatment appellants rendered during this period.

In her petition, Leon alleges that she first went to Edinburg Regional on June 26, 2004, complaining of right pelvic pain.  An ultrasound was performed, and it was

---

[1]Appellee Faride Leon is also known as Faride Carmona.

determined that she had a cyst on her right ovary. Leon was given medicine for her pain and sent home. Two days later, Leon returned to Edinburg Regional, complaining of right lower abdominal pain, contractions, and back pain. Dr. Leal ordered another ultrasound, which revealed another cyst. Leon alleges that no evaluation of the fetus was performed during either ultrasound. Labor was then induced, and at some point before Daniela's delivery, Leon's care was transferred to Dr. Otero. Dr. Otero used a vacuum extractor to deliver Daniela. Leon alleges that Daniela had a large cephalhematoma, bruising, and was macrosomic.[2] Leon also alleges that Daniela suffered a fractured left clavicle and left Erb's palsy.[3]

Leon claims that the negligence and/or gross negligence of Dr. Otero, Dr. Leal, and McAllen Hospitals caused the fractured clavicle and Erb's palsy Daniela suffered during and after her delivery. As a result of these injuries, Leon claims that Daniela underwent a subsequent surgery and multiple physical therapy sessions to attempt improvement of Daniela's left arm and hand function. Leon claims actual (non-economic and economic) damages for Daniela's past and future physical and mental pain and suffering, disfigurement, physical impairment, inconvenience, past and future medical expenses, and loss of future earning capacity. She also claims exemplary damages.

---

[2]"Cephalhematoma" is a "blood cyst often occurring in newborn infants after normal delivery with no apparent trauma; blood accumulates between a single cranial bone and its lining membrane" and is "gradually absorbed, becomes firmer and smaller, and disappears by three months." IDA G. DOX ET AL., ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY C34 (1997). "Macrosomic" refers to an "abnormally large" body size, "such as that of a newborn infant of a diabetic mother." *Id.* at M2.

[3]The "clavicle" is the collar bone, i.e., the "long curved bone nearly horizontally placed nearly horizontally above [the] first rib." *Id.* at B21. Erb's palsy is defined as "[p]aralysis of the upper musculature of an infant's arm . . . caused by injury to the brachial plexus . . . during birth . . . [that is] usually associated with difficult breech delivery or forceps delivery." *Id.* at P4.

3

It is undisputed that Leon timely served the expert reports of Ezell S. Autrey, M.D. and John R. Seals, M.D. on each appellant, and each appellant filed objections to the reports, contesting their adequacy under section 74.351, and motions to dismiss Leon's claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)-(b). Leon responded to Dr. Otero's objections and motion to dismiss, and the record reflects that, after a hearing, the trial court entered an order, which noted that it heard Dr. Otero's objections and motions, found that Leon's expert reports were good faith efforts to comply with section 74.351, and granted Leon a thirty-day extension to file amended reports.[4] *See id.* § 74.351(c).

Thereafter, Leon served on each appellant the amended expert report of Dr. Autrey along with a copy of Dr. Seals's original report. Dr. Otero filed objections to the amended report and a second motion to dismiss Leon's claims. Neither Dr. Leal nor McAllen Hospitals filed objections to the amended report or second motions to dismiss. The trial court held a hearing and entered an order denying the appellants' motions to dismiss. This interlocutory appeal followed. *See id.* § 51.014(a)(9) (Vernon 2008) (authorizing an interlocutory appeal of the denial of a motion to dismiss filed under section 74.351(b)).

## II. STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's decision on a motion to dismiss under section 74.351 of the civil practice and remedies code for abuse of discretion. *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b). The trial court

---

[4]No reporter's record of that hearing appears in the appellate record. Leon did not respond to the objections and motions to dismiss filed by Dr. Leal and McAllen Hospitals.

4

abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

Under section 74.351 of the Texas Civil Practice and Remedies Code, a claimant must "serve on each party or the party's attorney" an expert report and curriculum vitae "not later than the 120th day after the date the original petition was filed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). An expert report is "a written report by an expert that provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6).

A "fair summary" of the applicable standard of care and breach identifies the type of care expected but not rendered. *Palacios*, 46 S.W.3d at 880. The causation requirement is met if the report explains the basis of the expert's statement, linking his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A conclusory report does not meet the statutory test because it does not satisfy *Palacios*. *Id.* at 53.

In our review of the expert report, we are limited to the four corners of the report in determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report. *Palacios*, 46 S.W.3d at 878; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*) (requiring that the trial court "grant a motion challenging the adequacy of the expert report only if appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statutory definition).

5

The report "need not marshal all the plaintiff's proof." *Palacios*, 46 S.W.3d at 878; *Jernigan*, 195 S.W.3d at 93. If the expert report puts the defendant on notice of the specific conduct complained of and provides the trial court a basis on which to conclude the claims have merit, the report represents a good-faith effort to comply with the statute. *Palacios*, 46 S.W.3d at 879.

## III. DISCUSSION

Appellants separately challenged the trial court's denial of their motions to dismiss, and we will thus address each of their issues in turn.

## A. Dr. Otero

By his first issue, Dr. Otero argues that the trial court erred in denying his motion to dismiss because Leon's amended expert reports do not adequately articulate the standard of care or explain the causal link between any alleged negligence by Dr. Otero and the injuries suffered by Daniela.

### 1. The Reports

Dr. Autrey's report stated that, at the time of Daniela's delivery, Leon was twenty-four years old, five feet five inches tall, and weighed over 355 pounds. Leon gained over thirty-three pounds during her pregnancy and, in the days immediately preceding Daniela's delivery, had elevated glucose levels. Leon was administered an epidural, and her labor was induced. Dr. Otero delivered Daniela with a vacuum extractor; she weighed eight pounds eleven ounces.

Dr. Autrey's report then included, in relevant part, the following discussion:

> The standard of care for a reasonably prudent obstetrician is to know
> the risk factors for shoulder dystocia, and to independently evaluate the

6

patient for these risk factors. Once Dr. Leal transferred Faride Carmona [Leon] and her baby to Dr. Otero he became responsible for their welfare. The standard of care requires that Dr. Otero perform an independent assessment of the patient. A reasonable obstetrician would have known and identified the risk factors above.

A reasonably prudent obstetrician when faced with a patient at significant risk for shoulder dystocia should not use a vacuum extractor or other tool to deliver the baby. . . .

The risk factors[] for shoulder dystocia . . . include primigravida,[5] short maternal stature, obesity, increased weight gain during the pregnancy, and induction of labor with epidural anesthesia. Dr. Otero breached the standard of care when he used a vacuum extractor to deliver Daniela Carmona.

There was no indication in the medical record for the use of the vacuum. According to the record the child was a large baby (macrocosmic) [sic], at the described stage of labor the patient had only been pushing for 14 minutes with no evidence of fetal distress. It is not uncommon for a first time mother to push for 2-3 hours. There was no reason to apply the vacuum. The use of tools such as the vacuum extractor is a decision made by the physician and its use in connection with shoulder dystocia is considered a substantial factor for brachial plexus injury and Erb's palsy.

The appearance of any of the risk factors mentioned above requires the obstetrician to have a plan to deal with a shoulder dystocia should it arise. The reasonably prudent obstetrician uses a selective approach, reserving epsisiotomy to facilitate maneuvers such as delivery of the posterior arm or internal rotation of the shoulders. The McRobert's maneuver is the single most effective intervention and should be performed first, followed by suprapubic pressure. Suprapubic pressure can be employed together with the McRobert's maneuver. Preparations should always be made for a Caesarean delivery with the necessary personnel and equipment to accomplish same.

The standard of care requires that a second nurse be in the room in position to do the McRobert's maneuver and apply suprapubic pressure as necessary. Dr. Otero departed from the standard of care by failing to recognize that Faride Carmona [Leon] demonstrated multiple risk factors for shoulder dystocia. He recklessly decided to proceed with an improper vacuum assisted vaginal delivery, rather than wait and apply the McRobert's

---

[5]"Primigravida" is defined as a "woman who has been pregnant only once." *Id.* at P72.

maneuver or perform a Caesarean delivery. Either of which would have avoided the shoulder fracture and brachial plexus nerve injury Daniela sustained at birth. . . .

When dictating a report an obstetrician is required to give an accurate account of the delivery and the status of the baby. Dr. Otero's delivery note states that there were no lacerations when in fact the nurse's notes clearly indicate that he repaired a midline laceration. Dr. Otero's dictated delivery note states the delivery was a "spontaneous vaginal delivery". Dr. Otero used a vacuum to affect the delivery. Therefore, this was a vacuum assisted vaginal delivery. By definition a vacuum assisted delivery is not spontaneous.

Dr. Otero's notes fail to indicate that Daniela Carmona had a large cephalohematoma, fractured left clavicle, bruising and a brachial plexus injury. None of these things were noted by Dr. Otero in his dictated delivery note. All of these findings are consistent with a traumatic vacuum assisted vaginal delivery with shoulder dystocia. Not a straight forward delivery as Dr. Otero indicates in his dictated operative note.

The departures from the standard of care by Fernando Otero, M.D. were the direct and foreseeable (proximate) cause of the injuries to Daniela Carmona. Daniela Carmona's brachial plexus injury, the left clavicle fracture, left Erb's palsy with subsequent surgery and the multiple physical therapy sessions required to attempt to improve her left arm and left hand function were avoidable and are a direct and foreseeable result of the inappropriate (negligent) use of the vacuum extractor.

In his report, Dr. Seals stated that he reviewed the birth, neonatal, and other medical

records regarding Daniela's Erb's palsy treatment. He then opined as follows:

These records document the occurrence in Daniela of a fractured clavicle and left Brachial Plexus Palsy (aka "Erb's" Palsy) in the newborn period. She appeared to have had some early partial improvement in movements of her left upper extremity, but continued to demonstrate significant motor impairment with muscle weakness and/or dysfunction of muscle groups from the shoulder to her forearm, wrist and fingers. Evaluation at the Scottish Rite Hospital in Dallas resulted in decisions to surgically intervene in hopes of improving overall function in her left arm. While these procedures improved some of the range of motion in that extremity, she has been left with significant compromise in motor functions, especially related to her shoulder girdle muscles.

8

The likely consequence of this type of injury, within reasonable medical probability, will significantly alter Daniela's growth and development throughout childhood and into adulthood. The areas of primary concern are both physical and psychological in nature. She will have to adapt to using predominantly her right upper extremity to carry out tasks that most children use both upper extremities to carry out. She will learn to use her left hand and arm only in a supportive and assisting fashion most of the time. Her shoulder instability will limit many activities requiring shoulder girdle muscle strength. This will obviously result in limitations regarding various sports activities as well as employment opportunities in the future. This type of disability is likely to have a significant psychological impact as she matures through her teens and into adulthood.

Erb's Palsy is a condition which is the result of a traumatic stretch injury to the brachial plexus during the birth process. It is well accepted that the mechanics of the injury include lateral flexion of the head while the shoulder is being held fixed against the mother's pelvic rim during the birthing process. Logically this is the only sequence of events that can adequately explain the forces necessary to result in the avulsion of nerve roots in the cervical spine region during birth.

## 2. Standard of Care

Dr. Otero contends that the articulated standard was insufficient because it referred to risk factors Leon did not have. In support of this contention, Dr. Otero points to the following risk factors enumerated in the section of Dr. Autrey's expert report devoted to Dr. Leal:

**Risk Factors for Shoulder Dystocia:**

- Suspected large baby – over 8 lbs 14 oz.
- maternal diabetes/gestational diabetes (fetal asymmetry)
- Maternal obesity
- An overdue baby – over 40 weeks
- Short maternal stature
- Contracted or flat (platypelloid) pelvis
- Maternal weight gain – more than 35 lbs.
- Protracted first stage of labor
- Prolonged second stage of labor

Dr. Otero contends that "the risk factors identified . . . [by Dr. Autrey] do not correlate to Dr. Autrey's recitation of Ms. Carmona's presentation" because Leon gained more than thirty-three pounds (instead of more than thirty-five) and Daniela weighed eight pounds eleven ounces at birth (instead of over eight pounds fourteen ounces). Dr. Otero also contends that Leon was not overdue and did not have histories of prolonged first or second stages of labor. Dr. Otero claims that Dr. Autrey's report listed only one of the foregoing risk factors for Leon—obesity.

We cannot conclude that the minute difference between Leon's weight gain and Daniela's birth weight and those listed in the above risk factors merits the attention paid by Dr. Otero in his brief. Rather, we think it clear that Leon exhibited the risk factors stated by Dr. Autrey elsewhere in his report—"primigravida, short maternal stature, obesity, increased weight gain during the pregnancy, and induction of labor with epidural anesthesia"—and will not invalidate Dr. Autrey's carefully stated standard of care based on the proverbial splitting of hairs urged by Dr. Otero on appeal. Dr. Autrey articulated the type of care expected from Dr. Otero but not rendered, and we thus conclude that Leon's expert reports sufficiently set forth the standard of care as required by section 74.351. *See Palacios*, 46 S.W.3d at 880.

### 3. Causation

Dr. Otero also contends by his first issue that Leon's expert reports are deficient as to causation because the statements in the reports regarding causation are conclusory and do not link any breach by Dr. Otero to the injuries claimed by Leon in her suit. Dr. Otero contends that Leon's reports fail to explain how the use of a vacuum extractor—the breach

identified by Dr. Autrey in his report—caused the fractured left clavicle and brachial plexus injury (i.e., Erb's palsy) suffered by Daniela. We disagree.

When read together, the reports of Dr. Autrey and Dr. Seals contain an adequate factual basis linking Dr. Otero's breach to Daniela's injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 75.351(i) (allowing multiple experts to address the issue of causation); *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. Dr. Autrey opines that the "use of tools such as the vacuum extractor is a decision made by the physician and its use in connection with shoulder dystocia is considered a substantial factor for brachial plexus injury and Erb's palsy" and that Daniela's fractured clavicle, bruising, and brachial plexus injury "are consistent with a traumatic vacuum[-]assisted vaginal delivery with shoulder dystocia." Dr. Seals provides the remainder of the factual basis for causation when he states that

> Erb's Palsy is a condition which is the result of a traumatic stretch injury to the brachial plexus during the birth process. It is well accepted that the mechanics of the injury include lateral flexion of the head while the shoulder is being held fixed against the mother's pelvic rim during the birthing process. Logically this is the only sequence of events that can adequately explain the forces necessary to result in the avulsion of nerve roots in the cervical spine region during birth.

Dr. Autrey's conclusions then complete the causation analysis when he states that the "departures from the standard of care by [Dr. Otero] were the direct and foreseeable (proximate) cause of the injuries to Daniela Carmona" and that "Daniela Carmona's brachial plexus injury, the left clavicle fracture, left Erb's palsy with subsequent surgery and the multiple physical therapy sessions required to attempt to improve her left arm and left hand function were avoidable and are a direct and foreseeable result of the inappropriate (negligent) use of the vacuum extractor."

11

We conclude that, when read together, Leon's expert reports explain that a birth involving shoulder dystocia—"the shoulder [of the baby] . . . being held fixed against the mother's pelvic rim during the birthing process"—should foreclose the use of a vacuum because the "mechanics of the [Erb's palsy] injury include lateral flexion of the head" while the baby's head is fixed against the mother's pelvis and a resulting "traumatic stretch injury to the brachial plexus during the birth process." *See Windsor v. Maxwell*, 121 S.W.3d 42, 48 (Tex. App.–Fort Worth 2003, pet. denied) (holding that a report is sufficient if it "contains information summarizing and explaining the causal relationship between the doctor's failure to meet the applicable standards of care and the plaintiff's injury"); *see also Barrerra v. Rico*, No. 13-04-00480-CV, 2008 WL 4823991, at *5-6 (Tex. App.–Corpus Christi Nov. 6, 2008, pet. denied) (mem. op.) (holding that plaintiff's report was sufficiently specific as to causation where the expert included facts regarding the use of excessive traction and stretching, tearing, and avulsion of the infant's shoulder, arm, and hand). In light of the foregoing facts, we also conclude that the expert reports adequately describe how Daniela's fractured clavicle is "consistent with a traumatic vacuum[-]assisted vaginal delivery with shoulder dystocia." In sum, looking only to the four corners of her reports, we conclude that Leon adequately addressed causation. *See Palacios*, 46 S.W.3d at 878. The statements in the reports related to causation are not conclusory but, in fact, provide a factual basis linking Dr. Otero's breach to Daniela's claimed injuries. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52-53.

### 4. Conclusion

Thus, the trial court did not abuse its discretion in denying Dr. Otero's motion to dismiss. We hold that Leon's report adequately identified the applicable standard of care

12

and Dr. Otero's breach and explained how the breach caused Daniela's injuries. *See Palacios*, 46 S.W.3d at 878. The report was a good faith effort to comply with the statute because it put Dr. Otero on notice of the specific conduct complained of and provided the trial court a basis on which to conclude the claims have merit. *See id.* at 879; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). Dr. Otero's first issue is overruled.

Having concluded that Leon's expert reports were sufficient as to Dr. Otero and that the trial court did not err in denying his motion to dismiss on that basis, we do not reach Dr. Otero's issue regarding attorneys' fees.[6] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

## B. McAllen Hospitals and Dr. Leal

### 1. Waiver

By McAllen Hospital's sole issue and Dr. Leal's second, both parties complain that Leon's amended expert reports were inadequate under section 74.351 and that the trial court thus erred in denying their motions to dismiss her claims. However, we do not reach their complaints because we have concluded that both McAllen Hospitals and Dr. Leal waived them by failing to object to the amended reports within twenty-one days of service. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

In a recent, remarkably similar case, the Beaumont Court of Appeals addressed a situation in which multiple defendants objected to the initial expert report filed by the

---

[6]We note that Dr. Otero has named Leon's attorney as a party to this appeal, presumably in an attempt to collect fees and costs directly from Leon's attorney. But we have determined that attorneys' fees are unavailable because the trial court has not yet dismissed Leon's suit; therefore, we decline to address the issue of whether section 74.351(b) permits the recovery of attorney's fees from a claimant's attorney. *See Salinas v. Dimas*, 310 S.W.3d 106, 2010 Tex. App. LEXIS 1987, at *14-15 (Tex. App.–Corpus Christi Mar. 18, 2010, pet. denied); *Haddad v. Marroquin*, No. 13-08-00139-CV, 2009 WL 2192737, at *4 (Tex. App.–Corpus Christi July 23, 2009, pet. denied) (mem. op.).

claimant but only the co-defendants of the appellant doctor pursued their objections to hearings before the trial court. *Gordon v. Sebile*, No. 09-10-00007-CV, 2010 WL 1610758, at *1 (Tex. App.–Beaumont Apr. 22, 2010, no pet.). After the hearings, the trial court, referencing only the co-defendants, granted the claimant a thirty-day extension to file an amended expert report, which was then served on all the parties. *Id.* Only the co-defendants filed objections to the amended report. *Id.* The court decided that the appellant doctor waived his complaint regarding the adequacy of the amended expert report because he failed to object to the amended report. *Id.* at *3. The court stated that section 74.351(a)

> requires physicians "whose conduct is implicated in a report" to file "any objection to the sufficiency of the report not later than the 21st day after the date it was served." In our opinion, when a party files an expert report pursuant to the trial court's express permission in order to cure a deficient report, the new expert report constitutes "a report" within the meaning of section 74.351(a), thus triggering the physician's or health care provider's obligation to file specific objections to the new report within twenty-one days of being served with the report. If no objections are filed to a report that implicates the physician[ or health care provider]'s conduct, by the plain wording of the statute, "all objections are waived." In our opinion, and in light of the clear language of the statute, whether exceptions should exist to the legislatively created waiver is a matter best left to the Legislature.

*Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)); *see also HealthSouth Corp. v. Searcy*, 228 S.W.3d 907, 909 (Tex. App.–Dallas 2007, no pet.) (holding that an amended expert report "supplants" the previously filed report and that there was nothing for the court to review where the defendant health care provider did not object to the amended report); *Desai v. Garcia*, No. 09-06-00332-CV, 2006 WL 3627008, at *2 (Tex. App.–Beaumont Dec. 14, 2006, no pet.) (mem. op.) (affirming denial of doctor's motion to dismiss where he failed to timely object to amended expert report). We agree with our sister courts.

The amended expert reports implicated the conduct of both McAllen Hospitals and Dr. Leal. Although both McAllen Hospitals and Dr. Leal objected to the initial expert reports served by Leon, neither objected to the amended reports served after the trial court granted Leon a thirty-day extension. They thus waived any objection regarding the adequacy of her reports, and we cannot conclude that the trial court abused its discretion in denying McAllen Hospitals and Dr. Leal's motions to dismiss. *See Gordon*, 2010 WL 1610758, at *3. Their issues related to the sufficiency of Leon's expert reports are overruled.

**2. Timeliness**

By his first issue, Dr. Leal argues that Leon's amended reports were untimely because the trial court's order granting Leon a thirty-day extension to amend referenced only Dr. Otero. Dr. Leal argues that, in light of this order, we should only consider Leon's initial expert reports when determining whether Leon complied with the expert report requirement in her claims against Dr. Leal. We are unpersuaded by Dr. Leal's argument. An amended expert report served after a thirty-day extension granted by the trial court supercedes the initial report filed by the claimant. *See HealthSouth Corp.*, 228 S.W.3d at 909 (citing *CIGNA Ins. Co. v. TPG Store, Inc.*, 894 S.W.2d 431, 434 (Tex. App.–Austin 1995, no writ)). It matters not that the order granting the extension referenced only Dr. Otero. *See id.* We conclude, as did our sister court in *Gordon*, that the amended report applied to all of the defendants. *See Gordon*, 2010 WL 1610758, at *3 (declining to adopt the appellant doctor's argument that the amended report was untimely as to him even

where the thirty-day extension was expressly granted in light of his co-defendant's objections).  Dr. Leal's first issue is overruled.

## IV. Conclusion

The order of the trial court denying appellants' motions to dismiss is affirmed.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
15th day of July, 2010.

16