

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00150-CV

_____

SAGORA SENIOR LIVING, INC., WTCG GRANBURY CAMPUS, LLC D/B/A
WATERVIEW - THE COVE, AND WATERVIEW THE COVE ASSISTED
LIVING AND MEMORY CARE, Appellants

V.

ANDREA WOOD AND JAMIE JACKSON, Appellees

_____

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. C2023334

_____

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

In this interlocutory appeal, appellants Sagora Senior Living, Inc., WTCG Granbury Campus, LLC d/b/a Waterview – The Cove, and Waterview The Cove Assisted Living and Memory Care (collectively, Appellants) appeal from the trial court's order denying their motion to dismiss the healthcare-liability claims brought against them by appellees Andrea Wood and Jamie Jackson (collectively, Appellees) arising from the death of Appellees' mother Carla Strasner, who was living in one of Appellants' assisted-living facilities at the time of her death. In two issues, Appellants argue that (1) the trial court abused its discretion by denying their motion to dismiss Appellees' claims because Appellees failed to tender an adequate medical expert report and (2) the trial court erred by failing to award Appellants attorney's fees. We will affirm.

## I. Background[1]

In the fall of 2021, Strasner—a 59-year-old woman with a medical history of traumatic brain injury—lived in an assisted-living facility owned by Appellants. Strasner had been prescribed and was taking two prescription medications with warnings against alcohol use. During her residence in the assisted-living facility, Strasner was provided with and consumed copious amounts of alcohol.

---

[1]The facts recited are drawn from those alleged in the petition and the medical expert's report and supplemental report at issue in this case. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 221 n.1 (Tex. 2018).

At approximately 6:40 p.m. on October 1, 2021, a nurse discovered Strasner facedown and unconscious in her apartment at the assisted-living facility. Emergency medical services arrived and resuscitated Strasner before transporting her to Lake Granbury Medical Center.

Strasner arrived at Lake Granbury Medical Center with diffuse pneumonia of the lungs, most likely caused by aspiration. Strasner also had an acute odontoid fracture that likely resulted from a forward facedown fall with hyperextension of the neck. Strasner's ethyl alcohol level was 119 mg at approximately 8:50 p.m.[2]

Later that evening, Strasner was transported to Texas Harris Health in Fort Worth where she died two days later. Her immediate cause of death was aspiration pneumonia, and her "sequential underlying cause of death" was alcohol intoxication.

Appellees sued Appellants for negligence and wrongful death. Appellees served Appellants with their Chapter 74 expert report from Dr. Lige Rushing. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 74.351. In his report, Rushing stated his qualifications,[3] and based on medical records from only Texas Harris Health, he opined as follows:

> Some facilities do provide alcoholic beverages for residents[,] i.e.[,] a so-called "happy hour[.]" When a facility does provide alcoholic beverages

---

[2]According to interpretive notes in Strasner's medical records, an ethyl alcohol level of 100 mg "may be intoxicated," and a level of 300 mg "may be associated with coma."

[3]Rushing did not serve a copy of his curriculum vitae with this report.

for its residents[,] close supervision must be provided to avoid alcoholic intoxication. A facility such as the defendant facility in this case must provide a safe environment for its residents. This includes but is not limited to prevention of falls, assaults, elopements, and intoxication with alcoholic beverages.

Based upon the records available to me at the time of this report[, it] is my opinion that the defendant assisted living facility's care fell below the accepted standards in the following ways:

1. Fail[ed] to keep and provide adequate records.

2. Failed to provide adequate supervision for Carla Strasner.

3. Failed to prevent Carla Strasner's alcoholic intoxication.

It is my opinion, based on reasonable medical probability, that more likely than not the failures outlined here proximately caused Carla Strasner's death[.]

Appellants objected to Rushing's report and moved to dismiss Appellees' claims, arguing that Rushing was not qualified to render an opinion regarding the standard of care and that his report was deficient because he failed to articulate the applicable standard of care, he failed to identify how Appellants breached that standard, and his opinions regarding causation were speculative and conclusory. *See id.* § 74.351(a)–(b), (*l*), (r)(6). At the hearing on Appellants' objections and motion to dismiss, the trial court granted Appellees thirty days to cure any deficiencies. *See id.* § 74.351(c).

Rushing supplemented his expert report, and Appellees served Appellants with his supplemental report, along with a copy of his curriculum vitae. Rushing's supplemental report recited his qualifications and stated that he had reviewed

Strasner's death certificate; psychiatric consultation records; assisted-living-facility admission records; medical records, toxicology reports, and imaging studies from Lake Granbury Medical Center; and medical records and toxicology reports from Texas Health Harris. After summarizing the case's facts, Rushing opined as follows:

> [M]edical records . . . reflect that Carla Strasner was receiving the following medications which could accentuate the effect of alcohol on the body or lead to seizures:
>
> Aripiprazole ([A]bilify)[,] which contains a warning suggesting caution with patients at risk of seizures, including those with a history of seizures, head trauma, brain damage, alcoholism, or concurrent therapy with medications which may lower seizure threshold. Elderly patients may be at increased risk of seizures due to any increase[d] prevalence of predisposing factors.
>
> Trazadone[,] which is a CNS depressant, carries a warning that . . . it could cause sudden falls and carries a precautionary warning stating "may cause falls and major osteoporotic fractures when used in elderly patients.["] Additionally, it carries a warning suggesting caution with patients at risk of seizures, including those with a history of seizures, head trauma, brain damage, alcoholism, or concurrent therapy with medications which may lower seizure threshold.
>
> It is well recognized that CNS depressants should not be combined with alcohol consumption and the history of Carla Strasner's traumatic brain injury or head trauma shows that the medications which Carla Strasner was receiving should have been closely monitored at all times and alcohol consumption avoided.
>
> The standard of care for any long-term care facility, assisted living facility, or home health care require[s] that they neither accept nor retain a resident whose needs they are unable to meet. Namely, Carla Strasner has a specific need to be monitored for her medications and alcohol consumption, and this need was not met. Contemporaneously, another standard of care would require that any facility mentioned herein would notate, document, and communicate about the medications and possible

5

adverse reactions to all [RNs and LVNs] on duty daily to ensure the safety of the patient.

Some facilities do provide alcoholic beverages for residents[,] i.e.[,] a so-called "happy hour[."] When a facility does provide alcoholic beverages for its residents[,] close supervision must be provided to avoid alcoholic intoxication. A facility such as the defendant facility in this case must provide a safe environment for its residents. This includes but is not limited to prevention of falls, assaults, elopements, and intoxication with alcoholic beverages.

In Carla Strasner's situation, Defendants failed to properly assess Carla Strasner's conditions and needs prior to her admission[ and] to correctly and properly assess, supervise, and care for Carla Strasner after admission. Had Defendants properly supervised Carla Strasner[,] the alcohol intoxication that [led] to the aspiration and subsequent death could have more likely than not been prevented.

Based upon the records available to me at the time of this report, it is my opinion that the facility [in] which Carla Strasner was a residing patient should have or could have known that the medications coupled with a traumatic brain injury, a seizure disorder, and alcohol consumption may lead to injury or death. The negligence of the facility and staff during supervising Carla Strasner during her stay is a proximate cause of Carla Strasner's death.

I am of the opinion that had the facility Carla Strasner was residing in taken appropriate action supervising medications and the patient in conformity with the standards of care required for any assisted living facility[,] Carla Strasner could potentially still be alive today.

Appellants objected to Rushing's supplemental report and moved to dismiss Appellees' claims, arguing that Rushing had once again failed to establish that he was qualified to render an opinion regarding the applicable standard of care.

After a hearing, the trial court signed an order overruling Appellants' objections to Rushing's report and supplemental report and denying their motions to dismiss. *See id.* § 74.351(b). Appellants timely filed a notice of appeal. *See id.* § 51.014(a)(9); Tex. R.

6

App. P. 26.1(b), 28.1(a)–(b). In two issues, Appellants challenge the adequacy of Rushing's report and supplemental report and the trial court's failure to award them attorney's fees.

## II. Standard of Review and Applicable Law

We review a trial court's decision on a motion to dismiss a healthcare-liability claim based on the adequacy of an expert report for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). "In analyzing a report's sufficiency under this standard, we consider only the information contained within the four corners of the report." *Abshire*, 563 S.W.3d at 223.

Chapter 74 of the Texas Civil Practice and Remedies Code requires a healthcare-liability claimant to serve an expert report on each defendant within 120 days after the defendant answers. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). Each defendant must object to the sufficiency of an expert report within twenty-one days of service of the report. *Id.* Objections not presented within that time are waived. *Id.*

The trial court must dismiss the suit if the claimant fails to provide a sufficient report. *Id.* § 74.351(b)(2). In determining a report's sufficiency, "the trial court need only find that the report constitutes a 'good faith effort' to comply with the statutory requirements." *Abshire*, 563 S.W.3d at 223 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*)). A good-faith effort exists when a report "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to

7

conclude the claims have merit." *Id.* (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A valid report must fairly summarize the applicable standard of care, explain how the defendant failed to meet that standard, and establish the causal relationship between the failure and the alleged harm. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the [defendant]." *Id.*

While an expert report "need not marshal all the claimant's proof," it must do more than merely state the expert's conclusions about the standard of care, breach, and causation to be sufficient. *Abshire*, 563 S.W.3d at 223 (quoting *Palacios*, 46 S.W.3d at 878). A report is not required to meet the standards of summary-judgment evidence, *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017), or convince the reader that its conclusions are reasonable, *Abshire*, 563 S.W.3d at 226.

### III. Sufficiency of Rushing's Report

Appellants argue in their first issue that the trial court abused its discretion by overruling their objections to Rushing's Chapter 74 expert report and denying their motion to dismiss because Rushing's report failed to (1) establish that he was qualified to offer an opinion on the applicable standard of care; (2) articulate an applicable standard of care or how Appellants breached that standard; and (3) establish a causal connection between their alleged conduct and Strasner's death. We address each of these arguments in turn.

## A. Qualifications

Appellants assert that although Rushing's report, supplemental report, and curriculum vitae reflect that he is a physician practicing internal medicine, rheumatology, and geriatrics, he has not had any education, training, or experience that would qualify him to opine on the applicable standard of care for assisted-living facilities.

To qualify as an expert witness on the issue of whether a healthcare provider departed from the accepted standards of care, a witness must (1) practice healthcare in a field of practice that involves the same type of care or treatment as that delivered by the healthcare provider, if the healthcare provider is an individual, at the time the testimony is given, or must have been practicing that type of healthcare when the claim arose, (2) have knowledge of accepted standards of care for healthcare providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and (3) qualify on the basis of training or experience to offer an expert opinion regarding those accepted standards of healthcare. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b).

To determine whether a witness is qualified based on training and experience, we consider whether the witness is (1) certified by a state licensing agency or national professional certifying agency or has other substantial training or experience in the area of healthcare relevant to the claim and (2) actively practicing healthcare in rendering healthcare services relevant to the claim. *See id.* § 74.402(c). An expert's

9

qualifications must appear in the report or in the expert's curriculum vitae; these qualifications cannot be inferred. *Jacksboro Nursing Operations, LLC v. Norman*, No. 02-20-00262-CV, 2021 WL 1421431, at *4 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.). "Although not every licensed doctor is qualified to testify on every medical question, we must be careful not to draw expert qualifications too narrowly." *Adeyemi v. Guerrero*, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.). "The critical inquiry is 'whether the expert's expertise goes to the very matter on which he or she is to give an opinion.'" *Justin I Enters., LLC v. Gierczak*, No. 02-24-00363-CV, 2025 WL 285335, at *4 (Tex. App.—Fort Worth Jan. 23, 2025, pet. denied) (mem. op.) (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)). "[A]s with other aspects of the expert report, our review of whether an expert has demonstrated his or her qualifications is limited to the four corners of the expert's report and attached curriculum vitae." *Id.* at *5.

Here, Rushing's report, supplemental report, and curriculum vitae established that he received his medical degree from Baylor University College of Medicine and a Master of Science degree in medicine from the University of Minnesota. He is board certified in internal medicine, rheumatology, and geriatrics and currently practices medicine in those areas. Rushing went on to explain in his supplemental report his qualifications to opine on the standard of care applicable to assisted-living facilities:

> In the regular course of my practice, I have provided care for more than 10,000 patients in nursing homes, assisted living facilities, group homes, and home health facilities. I have been permitted to testify in Texas

10

Courts regarding the standards of care for long-term care facilities per se, [and the] standard of care [for] nurses, nurse[']s aid[e]s, and physicians who provide care for nursing homes and assisted living patients.

As a board[-]certified practicing Gerontologist[,] I have regularly treated patients with Alzheimer[']s] disease in secured Alzheimer[']s] units and long-term care facilities, and [I] currently provide care to patients with Alzheimer[']s] disease[,] an[d] of the care provided, I have treated various symptoms associated with Alzheimer[']s] such as seizures, anorexia, and other associated Alzheimer[']s] [s]ymptoms.

In the regular course of my practice, I have written orders for Alzheimer[']s] patients and have supervised the execution of these orders by the various nurses, nurse[']s] aid[e]s, [and] orderlies[ ] that have actually provided the direct hands-on care for the patients at my direction and supervision. In addition, during my regular course of practice I have supervised and directed numerous registered nurses, certified nursing assistants, and/or license[d] vocational nurses who regularly provided care for patients in long-term care facilities and assisted living facilities. I have supervised the discharge and transfer of patients, those patients[']] treatment plans between the various facilities such as long-term care facilities, hospital[s], home health care, and assisted living facilities [the] same as the type of facility in which Carla Strasner was a patient.

Because of my education, training, experience and board certifications, I am intimately familiar with the standards of care for long-term care facilities, [RNs, LVNs], and nursing assistants who provide care for long-term care facilities and/or assisted living facilities [the] same as which Carla Strasner was a resident of. I have attached my CV hereto.

Based on these statements, along with those in Rushing's initial report and curriculum vitae, we conclude that the trial court acted within its discretion in overruling Appellants' objections to Rushing's qualifications to render an opinion on the standard of care applicable to assisted-living facilities. *See Cook Children's Med. Ctr. v. C.R.*, No. 02-18-00248-CV, 2019 WL 1185602, at *8 (Tex. App.—Fort Worth Mar.

11

14, 2019, no pet.) (mem. op.) (explaining that "[i]f a physician states he is familiar with the standard of care and responsibilities and requirements for the non-physician health care provider defendant . . . and he has worked with, interacted with, and supervised that category of non-physician health care provider, the physician is qualified to opine on the issue of whether the health care provider departed from the accepted standards of care for health care providers"). We therefore overrule this part of Appellants' first issue.

## B. Standard of Care, Breach, and Causation

In the remainder of their first issue, Appellants argue that Rushing's supplemental report fails to properly articulate an applicable standard of care, explain how Appellants breached that standard, or establish a causal connection between their alleged conduct and Strasner's death.

An expert report must adequately identify the standard of care. *See Palacios*, 46 S.W.3d at 879–80. The generally accepted standard of care in healthcare-liability cases is "what an ordinary prudent [healthcare provider] would do under the same or similar circumstances." *Id.* at 880. The report must explain how the healthcare provider breached that standard of care, *see id.*, and explain "how and why" the alleged breach caused the injury in question, *Abshire*, 563 S.W.3d at 224.

Here, Appellants objected to Rushing's original report on the grounds that he had failed to articulate the applicable standard of care, that he had failed to identify how they breached that standard, and that his opinions regarding causation were

12

speculative and conclusory. Appellants, however, did not reurge those objections in response to Rushing's supplemental report, which—as shown above—laid out additional standards of care, breaches of those standards, and causation opinions. Appellants' objections to Rushing's supplemental report were limited to his expert qualifications.

Appellants argue on appeal that Rushing's supplemental report was deficient because it did not articulate an applicable standard of care, explain how Appellants breached that standard, or establish a causal connection between their alleged conduct and Strasner's death. Because Appellants did not object to Rushing's supplemental report on these grounds in the trial court, their remaining arguments in their first issue have not been preserved for our review. *See, e.g.*, *Marino v. Wilkins*, 393 S.W.3d 318, 330 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (holding that objections lodged in response to expert's initial report but not repeated in response to the amended report were waived); *Otero v. Leon*, 319 S.W.3d 195, 204–05 (Tex. App.—Corpus Christi–Edinburg 2010, pet. denied) (holding objections lodged at first report were waived because defendants did not object to amended report served after trial court granted 30-day extension to cure any deficiencies in report); *Gordon v. Sebile*, 311 S.W.3d 190, 193 (Tex. App.—Beaumont 2010, no pet.) (concluding that defendant who objected to expert's initial report was required to object, within 21 days, to expert's second report to avoid waiving objections to that report, even if second report added only inconsequential references to physician standards and only

13

material change applied to a different defendant); *see also Plemons v. Harris*, No. 2-08-326-CV, 2009 WL 51290, at *3 (Tex. App.—Fort Worth Jan. 8, 2009, no pet.) (mem. op.) (holding objection to expert report made in trial court must comport with complaint asserted on appeal). We therefore overrule the rest of Appellants' first issue.

## IV. Conclusion

Having overruled Appellants' first issue, we need not address their second issue in which they argue that the trial court erred by failing to award them attorney's fees for Appellees' failure to tender an expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b); Tex. R. App. P. 47.1. We therefore affirm the trial court's order.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: September 11, 2025

14