**FILED**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI - EDINBURG

**081415**

**CECILE FOY GSANGER, CLERK**
**BY mquilantan**

ACCEPTED
13-15-00119-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
8/14/2015 6:10:54 PM
CECILE FOY GSANGER
CLERK

**RECEIVED**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI - EDINBURG

8/14/2015

**CECILE FOY GSANGER, CLERK**
**BY scarranza**

# NO. 13-14-00700-CV
### CONSOLIDATED WITH
# NO. 13-15-00119-CV

### IN THE THIRTEENTH COURT OF APPEALS
### CORPUS CHRISTI-EDINBURG, TEXAS

HARLINGEN MEDICAL CENTER, LIMITED PARTNERSHIP,

Appellant,

v.

ROSA ANDRADE, AS NEXT FRIEND OF
MARY HELEN ANDRADE, A MINOR CHILD, ET. AL.

Appellees.

On Appeal from the 404th Judicial District Court, Cameron County, Texas
Trial Court Cause No. 2014-DCL-1353-G

## APPELLEES' RESPONSE BRIEF

**F. Leighton Durham, III**
State Bar No. 24012569
ldurham@texasappeals.com
**Kirk L. Pittard**
State Bar No. 24010313
kpittard@texasappeals.com
**Morgan A. McPheeters**
State Bar No. 24081279
mmcpheeters@texasappeals.com
KELLY, DURHAM & PITTARD, LLP
PO Box 224626
Dallas, TX 75222
(214) 946-8000 (Telephone)
(214) 946-8433 (Facsimile)

**Laura E. Gutierrez Tamez**
State Bar No. 00793869
lrtamez@herreralaw.com
**Jorge A. Herrera**
State Bar No. 24044242
jherrera@herreralaw.com
THE HERRERA LAW FIRM, INC.
111 Soledad Street, Suite I 900
San Antonio, Texas 78205
(210) 224-1054 (Telephone)
(210) 228-0887 (Facsimile)

**ORAL ARGUMENT REQUESTED\***

## IDENTITY OF PARTIES AND COUNSEL

As required by Texas Rule of Appellate Procedure 38.1(a), Appellant correctly identifies appellate counsel, trial counsel and all parties to this appeal. In addition to those identified by Appellant, Appellees identify the following appellate counsel.

**Appellate Counsel for Appellees:**  F. Leighton Durham, III
Kirk L. Pittard
Morgan A. McPheeters
KELLY, DURHAM & PITTARD, LLP
PO Box 224626
Dallas, TX 75222

# TABLE OF CONTENTS

PAGE

IDENTITY OF PARTIES AND COUNSEL ....................................................................... ii

TABLE OF AUTHORITIES .................................................................................... viii

STATEMENT OF THE RECORD ................................................................................ 2

STATEMENT REGARDING ORAL ARGUMENT ........................................................... 2

RESTATEMENT OF ISSUE PRESENTED ..................................................................... 4

STATEMENT OF FACTS......................................................................................... 5

    A.    Mr. Andrade presents at Harlingen Medical Center
        with severe chest pain........................................................................5

    B.    Mr. Andrade is diagnosed with a Type 1 (Stanford
        Type A) ascending aortic dissection, an emergent
        condition ..........................................................................................5

    C.    Dr. Lopez orders that Mr. Andrade be transferred to
        another hospital, but Harlingen Medical Center fails
        to carry out that order....................................................................7

    D.    Dr. Hilmy performs an inpatient cardiology
        consultation and orders that Mr. Andrade be
        transferred for emergent surgery.....................................................8

    E.    Harlingen Medical Center's second attempt to
        transfer Andrade is unsuccessful.....................................................8

PAGE

F.   Despite Andrade's emergent condition, Harlingen Medical Center's case management practitioners wait almost another full day to attempt another transfer ........................................................................9

G.   Unable to transfer Mr. Andrade to a facility that could provide him the emergent care he needed, Mr. Andrade dies at Harlingen Medical Center on December 22, 2011 ..............................................................10

H.   Mr. Andrade's family files suit and Harlingen Medical Center challenges their expert reports..........................10

I.   The Andrades submit another expert report in compliance with the trial court's order, and Harlingen Medical Center challenges it too .................................12

SUMMARY OF THE ARGUMENT ..........................................................................12

ARGUMENT AND AUTHORITIES.........................................................................14

I.   The applicable standard of review is abuse of discretion ....................14

II.   Initial expert reports need only satisfy minimal requirements under Chapter 74..............................................................15

III.   The trial court properly denied Harlingen Medical Center's motions to dismiss because Plaintiffs' expert reports meet the minimum requirements of § 74.351 ...........................18

A.  Plaintiffs' reports satisfactorily detailed the relevant standard of care required of Harlingen Medical Center ..........................................................................................19

B.  Plaintiffs' reports establish the manner in which Harlingen Medical Center breached the relevant standard of care ..........................................................................21

    i.  Case management failed to effectuate the transfer order by failing to obtain a physician-to-physician call and by failing to provide all relevant information to potential transfer facilities. (2 CR 364)................................................22

    ii.  Case management failed to continually work locate an accepting facility to care for Mr. Andrade starting on December 19, and failed to look statewide for an accepting facility. (2 CR 364-65)..........................................................25

    iii.  Case management failed to follow the chain of command and escalate the inability to secure an accepting facility. (2 CR 366).............................................26

    iv.  Case management failed to keep the physicians up to date on the inability to secure acceptance for transfer. (2 CR 366-67)................................27

C.  Plaintiffs' expert reports causally link Harlingen Medical Center's breach of the standard of care to Mr. Andrade's death..................................................................28

PAGE

i.   Dr. Adams and Dr. DeBehnke sufficiently
established causation.............................................................31

ii.  Harlingen Medical Center incorrectly argues
that Plaintiffs must conclusively establish
causation...............................................................................34

     1.   Chapter 74 does not require Plaintiffs to
conclusively establish causation................................35

     2.   Chapter 74 does not require Plaintiffs to
respond to or negate Harlingen Medical
Center's potential defenses ........................................36

     3.   Case law cited by Harlingen Medical
Center does not support its claim that
Plaintiffs must prove that a specific
hospital would have accepted Mr.
Andrade.......................................................................41

IV.  The Court need not address Harlingen Medical Center's
argument that it cannot be blamed for Dr. Lopez' decision
not to perform Mr. Andrade's surgery.....................................48

V.   If the Court finds that Plaintiffs' initial reports are
insufficient regarding causation, Plaintiffs are entitled to a
30-day extension to cure that deficiency .................................50

VI.  Conclusion ...............................................................................53

# TABLE OF CONTENTS (CONT'D)

PAGE

CERTIFICATE OF COMPLIANCE ................................................................56

CERTIFICATE OF SERVICE ....................................................................56

CASES                                                                                                    PAGE

*Abilene Reg'l Med. Ctr. v. Allen*,
 387 S.W.3d 914 (Tex. App.—Eastland 2012, pet. denied) ............................30

*Am. Transitional Care Ctrs. v. Palacios*,
 46 S.W.3d 873 (Tex. 2001)................................ 14, 16, 17, 18, 19, 21, 28, 34, 35

*Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*,
 278 S.W.3d 552 (Tex. App.—Dallas 2009, no pet.) .......................................41

*Bowie Memorial Hosp. v. Wright*,
 79 S.W.3d 48 (Tex. 2002)............................................. 15, 17, 29, 35, 38

*Certified EMS, Inc. v. Potts*,
 392 S.W.3d 625 (Tex. 2013)......................................... 13, 16, 18, 21, 34, 49, 53

*Costello v. Christus Santa Rosa Health Care Corp.*,
 141 S.W.3d 245 (Tex. App.—San Antonio 2004, no pet.) ............................29

*Dillard v. Tex. Elec. Co-op.*,
 157 S.W.3d 429 (Tex. 2005)............................................................................40

*Downer v. Aquamarine Operators, Inc.*,
 701 S.W.2d 238 (Tex. 1985)............................................................................15

*Estorque v. Schafer*,
 302 S.W.3d 19 (Tex. App.—Fort Worth 2009, no pet.).......................... 42, 43

*Fortner v. Hosp. of the Sw., LLP*,
 399 S.W.3d 373 (Tex. App.—Dallas 2013, no pet.) .......................... 30, 38, 41

*Gray v. CHCA Bayshore L.P.*,
 189 S.W.3d 855 (Tex. App.—Houston [1st Dist.] 2006, no pet.).................40

CASES (CONT'D)                                                                 PAGE

*Hutchinson v. Montemayor*,
   144 S.W.3d 614 (Tex. App.—San Antonio 2004, no pet.) ............... 16, 29, 35

*IHS Acquisition No. 140, Inc. v. Travis*,
   No. 13-07-481-CV, 2008 WL 1822780
   (Tex. App.—Corpus Christi Apr. 24, 2008, pet. denied) .............................16

*In re Stacy K. Boone*,
   223 S.W.3d 398 (Tex. App.—Amarillo 2006, orig. proceeding) .................40

*Jelinek v. Casas*,
   328 S.W.3d 526 (Tex. 2010) .............................................................................29

*Jernigan v. Langley*,
   195 S.W.3d 91 (Tex. 2006) ...............................................................................17

*Jones v. King*,
   255 S.W.3d 156 (Tex. App.—San Antonio 2008, pet. denied) ......... 42, 44, 45

*Leland v. Brandal*,
   257 S.W.3d 204 (Tex. 2008) .............................................................................52

*Lenger v. Physician's Gen. Hosp., Inc.*,
   455 S.W.2d 703 (Tex. 1970) ...................................................................... 29, 35

*Lewis v. Funderburk*,
   253 S.W.3d 204 (Tex. 2008) .............................................................................17

*Loaisiga v. Cerda*,
   379 S.W.3d 248 (Tex. 2012) .............................................................................18

**C**ASES (CONT'D)                                                                                                                        **P**AGE

*Otero v. Leon*,
    319 S.W.3d 195
    (Tex. App.—Corpus Christi 2010, pet. denied) .......................... 15, 18, 19, 54

*Patterson v. Ortiz*,
    412 S.W.3d 833 (Tex. App.—Dallas 2013, no pet.) ................................ 29, 35

*Renaissance Surgical Ctrs.-S. Tex., L.L.P. v. Jimenez*,
    No. 13-07-121-CV, 2008 WL 3971096
    (Tex. App.—Corpus Christi Aug. 28, 2008, no pet.) .....................................52

*Sanchez v. Martin*,
    378 S.W.3d 581 (Tex. App.—Dallas 2012, no pet.) ........................................17

*Schrapps v. Lam Pham*,
    No. 09-12-00080-CV, 2012 WL 4017768
    (Tex. App.—Beaumont Sept. 13, 2012, pet. denied) ........................ 38, 42, 47

*Tenet Hosp. Ltd. v. Love*,
    347 S.W.3d 743 (Tex. App.—El Paso 2011, no pet.)......................... 42, 45, 46

*Thota v. Young*,
    366 S.W.3d 678 (Tex. 2012)............................................................................39

*Walker v. Gutierrez*,
    111 S.W.3d 56 (Tex. 2003)..............................................................................15

*Whitfield v. Henson*,
    385 S.W.3d 708 (Tex. App.—Dallas 2012, no pet) .........................................41

STATUTES                                                                                      PAGE

Tex. Civ. Prac. & Rem. Code § 74.351 ............................................. 30, 34, 49, 53

Tex. Civ. Prac. & Rem. Code § 74.351(b) .........................................................16

Tex. Civ. Prac. & Rem. Code § 74.351(c) ................................................... 17, 53

Tex. Civ. Prac. & Rem. Code § 74.351(i) .........................................................30

Tex. Civ. Prac. & Rem. Code § 74.351(l) ................................................... 17, 18

Tex. Civ. Prac. & Rem. Code § 74.351(r)(6) ......................................... 16, 28, 36

# NO. 13-14-00700-CV
### CONSOLIDATED WITH
# NO. 13-15-00119-CV

## IN THE THIRTEENTH COURT OF APPEALS
## CORPUS CHRISTI-EDINBURG, TEXAS

HARLINGEN MEDICAL CENTER, LIMITED PARTNERSHIP,

Appellant,

v.

ROSA ANDRADE, AS NEXT FRIEND OF
MARY HELEN ANDRADE, A MINOR CHILD, ET. AL.

Appellees.

On Appeal from the 404th Judicial District Court, Cameron County, Texas
Trial Court Cause No. 2014-DCL-1353-G

## APPELLEES' RESPONSE BRIEF

1

## STATEMENT OF THE RECORD

This is a consolidation of two appeals of orders denying Appellant's motions to dismiss in the same case. The Clerk's Record related to the first appeal (Cause No. 13-14-00700-CV) will be referenced as "1 CR [page]." The Clerk's Record related to the second appeal (Cause No. 13-15-00119-CV) will be referenced as "2 CR [page]."

Similarly, the Reporter's Record from the first, October 30, 2014 hearing on Harlingen Medical Center's Motion to Dismiss for Insufficient Expert Reports (Cause No. 13-14-00700-CV) will be referenced as "1 RR [page]." The Reporter's Record from the second, February 17, 2015 hearing on Harlingen Medical Center's Second Motion to Dismiss for Insufficient Expert Reports (Cause No. 13-15-00119-CV) will be referenced as "2 RR [page]."

## STATEMENT REGARDING ORAL ARGUMENT

Because the issues in this case are relatively simple and straightforward and the law is well established, Appellees do not believe that oral argument is necessary and that this Court can easily affirm the trial court's ruling based on the briefs and record currently on file. However, if the Court grants Appellant's request for oral argument, Appellees request

the opportunity to participate.

## RESTATEMENT OF ISSUE PRESENTED

In light of the underlying purpose and minimal requirements for expert reports under Chapter 74 of the Texas Civil Practice and Remedies Code, did the trial court act within its discretion when it denied Appellant Harlingen Medical Center's motions to dismiss for insufficient reports, where the Andrades' expert reports adequately detailed the causal links between Harlingen Medical Center's breaches of the applicable standard of care and Mr. Andrade's death?

## A. Mr. Andrade presents at Harlingen Medical Center with severe chest pain.

On December 18, 2011, George Andrade arrived at Harlingen Medical Center's emergency room at approximately 3:30 pm, complaining of severe chest pain. (1 CR 228). The attending physician evaluated Andrade and ordered laboratory studies, a chest x-ray, and ordered a CT angiogram of Andrade's chest and abdomen to rule out aortic dissection. *Id.* At 5:45 pm, a second emergency room physician, Dr. Syed Ali, assumed care for Andrade and recommended admission to the hospital under the care of Dr. Nataraj Desai. *Id.* Thirty minutes later, Dr. Desai ordered Andrade's admission to the hospital, receipt of Lovenox, and a consult by Dr. David Yardley, a cardiologist. *Id.*

## B. Mr. Andrade is diagnosed with a Type 1 (Stanford Type A) ascending aortic dissection, an emergent condition.

The CT angiogram ordered while Andrade was in the emergency room revealed an aortic dissection, exactly what the doctors hoped to rule out. (1 CR 229). At 8:08 pm a second CT angiogram was performed, which confirmed the aortic dissection, but further indicated an "aortic dissection most consistent with a Type 1 or Stanford A dissection involving the

ascending aorta." *Id.*

The finding of a Type 1 (Stanford Type A) *ascending* aortic dissection is significant because it is a surgical emergency due to the high incidence of rupture or pericardial tamponade, resulting in immediate death. (1 CR 228). The standard of care for this type of tear in the wall of the aorta requires emergent surgical repair to prevent rupture and death. *Id.* A Type 1 dissection, if not treated urgently or emergently by surgical repair, is "universally fatal." (1 CR 231).

Dr. Yardley saw Andrade at 9:45 pm and confirmed that Andrade suffered from an ascending abdominal aortic dissection. (1 CR 229). Dr. Desai was also alerted of the results from the CT angiogram. *Id.* Dr. Yardley recommended that Andrade be admitted to the CCU and indicated that Dr. Shereef Hilmy would assume care the following day to perform an invasive angiography with possible covered graft stenting. *Id.*

A third CT angiogram was performed the following morning, December 19, on the orders of Dr. Hilmy. (1 CR 229). The radiologist documented that the image revealed an aortic dissection extending from the root of the aorta through the ascending and descending aorta to the left common iliac artery. *Id.*

6

**C.     Dr. Lopez orders that Mr. Andrade be transferred to another hospital, but Harlingen Medical Center fails to carry out that order.**

At 1:30 pm on December 19, vascular surgeon, Dr. Ruben Lopez recommended that Andrade be transferred because of the ascending aortic dissection.  Dr. Lopez recommended he be transferred to Houston. *Id.*

Dr. Desai called in an order of transfer.[1] *Id.* However, there was no documentation of an appropriate consultation by Dr. Lopez, documentation by any physician identifying the reason for transfer, or documentation of communication with the patient concerning the need for transfer. *Id.* Dr. Lopez signed a certification for transfer, but otherwise left the form completely blank. *Id.*

Harlingen Medical Center's case management department initiated transfer efforts to Memorial Hermann Hospital in Houston at 3:15 pm on December 19, which immediately rejected the transfer for "financial reasons." *Id.* No further orders to transfer Andrade to another facility were attempted that day. *Id.*

---

[1] That morning at 11:15 am, Dr. Desai completed a history and physical on Mr. Andrade, but incorrectly noted a finding of *descending* aortic dissection. *Id.* Dr. Desai mistakenly believed that the condition could be treated with cardiovascular surgery to place an endovascular graft. *Id.* However, Mr. Andrade was actually suffering from an *ascending* aortic dissection, which can only be treated through emergency surgery to repair the aortic root and to plicate the dissected aorta with a graft. *Id.*

**D.      Dr. Hilmy performs an inpatient cardiology consultation and orders that Mr. Andrade be transferred for emergent surgery.**

The next morning, two days after Mr. Andrade first presented at Harlingen Medical Center, Dr. Hilmy performed an "inpatient" cardiology consultation, again diagnosed Andrade with an *ascending* aortic dissection, and acknowledged that Andrade was not a candidate for endovascular graft. (1 CR 230). Like Dr. Lopez the day before, Dr. Hilmy recommended transfer to a higher level of care at a facility such as Methodist Hospital, Memorial Hermann, or Texas Heart Institute. *Id.* At 9:00 am, Dr. Desai noted Dr. Hilmy's diagnosis of an *ascending* aortic root dissection, Type 1, and at 10:45 am, ordered that Andrade be transferred to a higher level of care for emergency CT surgery. *Id.*

**E.      Harlingen Medical Center's second attempt to transfer Andrade is unsuccessful.**

At 1:00 pm on December 20, a second attempt to transfer Andrade to Memorial Hermann was unsuccessful. (1 CR 230). According to the case management notes, Andrade's transfer was refused by Memorial Hermann based on its mistaken belief that the "case is urgent and not emergent or else it would have been done yesterday." *Id.* There is no documentation that any physician called Memorial Herman Hospital to correct this error and, again,

8

the transfer certificate was blank. *Id.*

The case management nurse, Nurse Torres, contacted a second hospital, University of Texas Medical Branch Galveston, for transfer, but that hospital had no capacity. *Id.* Case management then attempted to contact Methodist Hospital in San Antonio. *Id.* The transfer coordinator for Methodist Hospital in San Antonio requested a physician-to-physician call but was unable to reach Dr. Desai after six attempts. *Id.* Finally, the cardiothoracic surgeon in San Antonio reached Dr. Desai, but declined to accept Andrade. *Id.* University Hospital in San Antonio also declined the patient, but the reason for doing so is not known. *Id.* No further attempts at transfer were made on December 20, and no one on Harlingen Medical Center's case management team attempted to initiate any calls by the physicians. *Id.*

**F.    Despite Andrade's emergent condition, Harlingen Medical Center's case management practitioners wait almost another full day to attempt another transfer.**

The next attempt at transfer did not occur for more than 17 hours. (1 CR 231). At 10:15 am on December 21, case management again requested transfer to Methodist Hospital in San Antonio. *Id.* At 1:30 pm, the request was again declined. *Id.* Later that afternoon, case management made another

attempt to facilitate a transfer to Memorial Hermann in Houston, but Memorial Hermann again declined the transfer. *Id.*

**G.**   **Unable to transfer Mr. Andrade to a facility that could provide him the emergent care he needed, Mr. Andrade dies at Harlingen Medical Center on December 22, 2011.**

Harlingen Medical Center made no further efforts to transfer Andrade. (1 CR 231). Predictably, on the morning of December 22, and 14 hours after Harlingen Medical Center last attempted a transfer, Mr. Andrade experienced a free rupture into his pericardium and died. *Id.* He was 47 years old. *See* (1 CR 228; 1 RR 55:7-11).

**H.**   **Mr. Andrade's family files suit and Harlingen Medical Center challenges their expert reports.**

On March 3, 2014, Mr. Andrade's surviving family members (Plaintiffs or Appellees) filed wrongful death and survival claims against Harlingen Medical Center, Dr. Yardley, Dr. Desai, Dr. Hilmy, and Dr. Lopez. (1 CR 6-23). As required by § 74.351 of the Texas Civil Practice and Remedies Code, Plaintiffs timely presented the defendants with initial expert reports from Dr. C. Warren Adams, Dr. Dan DeBehnke, and Mr. Ralph E. Cross. *See* (1 CR 227-98).

Harlingen Medical Center filed a Motion to Dismiss for Insufficient

Expert Reports on July 18, 2014, claiming that the expert reports:

(1) did not indicate that the experts were qualified to give expert opinions about the standard of care applicable to Harlingen Medical Center or its nurses or case managers and their breach of that standard;

(2) were conclusory as to how Harlingen Medical Center or its agents violated the applicable standards of care; and

(3) were conclusory and speculative regarding causation.

(1 CR 104).[2]

The trial court denied Harlingen Medical Center's motion except for its objection to the qualifications of Plaintiffs' experts to render an opinion concerning the standard of care applicable to Harlingen Medical Center, and granted the Andrades a 30-day extension to provide "a supplemental expert report from an expert qualified to render an opinion concerning the applicable standard of care for Harlingen Medical Center and whether that standard of care was breached." (1 CR 300). Harlingen Medical Center filed a Notice of Appeal of that order. (1 CR 304-06).

---

[2] Doctors Yardley, Desai, Hilmy, and Lopez also filed Objections to Plaintiffs' Expert Reports. *See* (1 CR 186). The trial court denied the defendant doctors' objections on November 12, 2014. (1 CR 299; 1 RR 75:4-76:11). Doctors Yardley, Hilmy, Lopez, and Desai did not appeal. (2 RR 24:21-25:5).

**I.** **The Andrades submit another expert report in compliance with the trial court's order, and Harlingen Medical Center challenges it too.**

Consistent with the trial court's order, Plaintiffs submitted a supplemental expert report of Mr. Gerald "Craig" Felty, a registered nurse and hospital administrator. (2 CR 359-68). Harlingen Medical Center filed a Second Motion to Dismiss on December 15, 2014. (2 CR 246-50). This time, Harlingen Medical Center did not question the expert's qualifications or opinions regarding standard of care and breach. Rather, Harlingen Medical Center objected to Felty's report because it included an allegedly improper and unsupported opinion on causation. (2 CR 246-50). Harlingen Medical Center argued that Felty was not qualified to provide an opinion on causation because he is not a physician. (2 CR 247-49). The trial court denied Harlingen Medical Center's Second Motion, (2 CR 377), and Harlingen Medical Center filed a Notice of Appeal of that order on March 9, 2015, (2 CR 378-80). This Court consolidated these two appeals on April 28, 2015.

SUMMARY OF THE ARGUMENT

The Texas Legislature's primary objective in requiring initial expert reports under Chapter 74 of the Texas Civil Practice and Remedies Code was to "deter baseless claims, not block earnest ones," and "to expeditiously

weed out claims that have no merit." *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013). The Andrades satisfied that requirement when they provided Harlingen Medical Center with four expert reports that collectively satisfy the requirements of Chapter 74.

The report of Mr. Felty meticulously details Harlingen Medical Center's failures to adhere to the relevant standards of care. Then, the reports of Doctors Adams and DeBehnke causally link Harlingen Medical Center's breaches of the standards of care to Mr. Andrade's death. These reports explain, in great detail and based on reasonable medical probability, that more likely than not Mr. Andrade would have been transferred to another facility to receive emergency treatment that would have saved his life.

In doing so, the reports sufficiently link Harlingen Medical Center's breaches of the standard of care directly to Mr. Andrade's death. The reports substantiate the Andrades' claims that Harlingen Medical Center's case management team failed to follow the proper procedures required to transfer a patient with an emergent medical condition and, as a consequence, failed to ensure that Mr. Andrade received the emergent care his life-threatening condition necessitated.

Harlingen Medical Center does not seriously dispute the sufficiency of

the reports. Instead, Harlingen Medical Center asks that this Court impose an additional requirement on the Andrades that the Legislature has not imposed. Harlingen Medical Center seeks to require that the Andrades also conclusively establish that, had Harlingen Medical Center done what it was supposed to and not breached the standard of care, another hospital would have taken Mr. Andrade. However, neither the case law nor the statute impose such an obligation.

The Andrades' reports, which unmistakably addressed standard of care, breach, and causation, were sufficient to meet the minimal and preliminary requirements of Chapter 74. Therefore, the trial court acted within its discretion and in accord with the purpose of Chapter 74 when it denied Harlingen Medical Center's motions to dismiss. This Court should affirm.

## ARGUMENT AND AUTHORITIES

## I.     The applicable standard of review is abuse of discretion.

A trial court's ruling concerning an expert report under Chapter 74 of the Texas Civil Practice and Remedies Code is reviewable for an abuse of discretion. *See Am. Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001); *Otero v. Leon*, 319 S.W.3d 195, 199 (Tex. App.—Corpus Christi 2010,

14

pet. denied). Harlingen Medical Center's brief largely ignores this standard of review, perhaps because the standard necessary to reverse a trial court's ruling on a motion to dismiss under Chapter 74 is so high.

Indeed, a trial court abuses its discretion only if "it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles," and an appellate court may not substitute its own judgment for the trial court's judgment. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). Accordingly, "[t]he mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). This Court must, therefore, determine "whether the trial court acted unreasonably and without reference to guiding principles" when it denied Harlingen Medical Center's motions to dismiss. *Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

## II. Initial expert reports need only satisfy minimal requirements under Chapter 74.

Plaintiffs in health care liability cases are required to provide each defendant an initial expert report with attached curriculum vitae "not later

than the 120th day after the date each defendant's original answer is filed."

Tex. Civ. Prac. & Rem. Code § 74.351(b). An "expert report" is:

> [A] written report by an expert that provides a *fair summary* of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code § 74.351(r)(6) (emphasis added). The Texas Supreme Court explains that a "'fair summary' is something less than a full statement of the applicable standard of care and how it was breached."[3] *Palacios*, 46 S.W.3d at 880 (internal quotations omitted). Rather, a "fair summary" must simply set out what care was expected but not given. *Id.*

A valid expert report has three elements: (1) it must fairly summarize the applicable standard of care; (2) it must explain how the health care provider failed to meet that standard; and (3) it must establish the causal relationship between the failure and harm alleged. *Certified EMS, Inc. v. Potts*,

---

[3] As this Court has noted, the Texas Supreme Court's interpretation of "fair summary" in *Palacios* "implies that there is some level of ambiguity—something less than an absolutely full description—that is left to the independent analysis of the trial court." *IHS Acquisition No. 140, Inc. v. Travis*, No. 13-07-481-CV, 2008 WL 1822780, at *9 (Tex. App.—Corpus Christi Apr. 24, 2008, pet. denied) (mem. op.); *see also Hutchinson v. Montemayor*, 144 S.W.3d 614, 617-18 (Tex. App.—San Antonio 2004, no pet.) (A "'fair summary' is something less than all of the evidence necessary to establish causation at trial.").

16

392 S.W.3d 625, 630 (Tex. 2013). The expert must explain the basis of his statements to link his conclusions to the facts. *Wright*, 79 S.W.3d at 52.

However, the expert report need not "marshal every bit of the plaintiff's evidence." *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006). Nor must the plaintiff "present evidence in the report as if it were actually litigating the merits." *Palacios*, 46 S.W.3d at 879 (The report does not need to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial.). Instead, plaintiffs must simply make "an objective good faith effort to comply" with the Chapter 74 expert report requirements. Tex. Civ. Prac. & Rem. Code § 74.351(*l*).[4]

The statute's primary objective is to "deter baseless claims, not block earnest ones," and "to expeditiously weed out claims that have no merit."

---

[4] Additionally, Chapter 74 provides a built-in protection for plaintiffs if their initial expert report is deficient. A trial court may grant a plaintiff a 30-day extension to cure a defective report as long as the defective report (1) is timely, (2) contains the opinion of an individual with expertise that the claim has merit, and (3) implicates the defendant's conduct. *Scoresby*, 346 S.W.3d at 557; *Sanchez v. Martin*, 378 S.W.3d 581, 595-96 (Tex. App.—Dallas 2012, no pet.); *see* Tex. Civ. Prac. & Rem. Code § 74.351(c). A deficient report may be cured by amending the report or by serving a new report from a separate expert that cures the deficiencies in the previously filed report. *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008).

17

*Potts*, 392 S.W.3d 625, 631 (Tex. 2013). [5] Thus, if a plaintiff timely files an expert report and a defendant objects to the report on the grounds that the report is inadequate, the trial court may dismiss "*only* if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . ." Tex. Civ. Prac. & Rem. Code § 74.351(*l*) (emphasis added). To constitute a "good faith effort," the report must (1) put the defendant on notice of the specific conduct complained of, and (2) provide the trial court a basis on which to conclude the claims have merit. *Otero*, 319 S.W.3d at 199 (citing *Palacios*, 46 S.W.3d at 879).

## III. The trial court properly denied Harlingen Medical Center's motions to dismiss because Plaintiffs' expert reports meet the minimum requirements of § 74.351.

Plaintiffs' expert reports collectively constituted an "objective good faith effort" to comply with Chapter 74. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*). Plaintiffs' experts are qualified to opine on the standard of care, breach, and causation applicable to Harlingen Medical Center.[6] Mr. Felty

---

[5] *See also Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring in part and dissenting in part) ("An expert report . . . is a low threshold a person claiming against a health care provider must cross merely to show that [her] claim is not frivolous.").

[6] In its first motion to dismiss, Harlingen Medical Center objected to the qualifications of Plaintiffs' initial experts—Dr. Adams, Dr. DeBehnke, and Mr. Cross—arguing that,

established the standard of care and Harlingen Medical Center's breaches of that standard, and Doctors Adams and DeBehnke established causation. Collectively, the reports (1) put Harlingen Medical Center on notice of the specific conduct complained of, and (2) provided the trial court a basis on which to conclude that the claims have merit. *See Otero*, 319 S.W.3d at 199; *Palacios*, 46 S.W.3d at 879. Therefore, this Court should affirm the trial court's denial of the motions to dismiss, because Plaintiffs' collective reports were sufficient under Chapter 74.

### A. Plaintiffs' reports satisfactorily detailed the relevant standard of care required of Harlingen Medical Center.

According to Mr. Felty's report, once a transfer order is placed, the standard of care for the nurse case managers, nursing supervisors, and nursing staff of Harlingen Medical Center includes the following

---

because these experts were not nurses or case managers, they were not qualified to opine on the standard of care applicable to nurses or case managers. (1 CR 103-15). Harlingen Medical Center did not challenge Dr. Adams' and Dr. DeBehnke's qualifications regarding causation. The trial court sustained Harlingen Medical Center's objection regarding qualifications for standard of care, so Plaintiffs supplemented their reports with a report from Mr. Felty. (1 CR 300; 2 CR 359-68). In its second motion to dismiss, Harlingen Medical Center challenged Mr. Felty's report only on the ground that Mr. Felty was not qualified to opine on causation. (2 CR 247-49). Harlingen Medical Center did not challenge Mr. Felty's qualifications or opinions regarding standard of care or breach. Accordingly, it is undisputed that Mr. Felty is qualified regarding standard of care and breach and Dr. Adams and Dr. DeBehnke are qualified regarding causation.

requirements:[7]

    (1)    Follow and carry out the physician transfer orders for an emergency condition on December 19, 20, 21, and 22 without delay;

    (2)    Research and identify all patient resources and facilities by obtaining the hospital's transfer agreements, contacting facilities ordered or finding those facilities capable of providing necessary care and treatment or engaging a transfer service;

    (3)    Ensure that a physician order of transfer of a patient with an emergency medical condition carries over between shift changes;

    (4)    Communicate fully with the receiving hospitals to convey critical information, including whether the transfer is emergent or urgent, the reason for the transfer, and the patient's proper diagnosis;

    (5)    Obtain a certification of patient transfer from a physician, certifying that the benefits to the patient of the transfer outweigh the risks and indicating the correct diagnosis and information regarding the patient's condition;

    (6)    Arrange for physician-to-physician calls to facilitate full communication about the patient's emergency condition, diagnosis, treatment, stabilization, and avoid miscommunication;

---

[7] Mr. Felty provided an opinion on the standard of care applicable to Harlingen Medical Center, which Harlingen Medical Center never challenged at the trial court and does not challenge here. Mr. Felty's opinion on the relevant standard of care is briefly summarized here for context.

(7) Invoke the chain of command when a physician's order cannot be carried out or the patient's needs are not being met;

(8) Obtain the patient's informed consent for transfer; and

(9) Communicate with attending physicians regarding the inability to secure a transfer.

*See* (2 CR 362-63). Accordingly, Mr. Felty's report provided a "fair summary" of the standard of care that Harlingen Medical Center was expected to provide to Mr. Andrade, thus complying with the requirements of Chapter 74. *See Palacios*, 46 S.W.3d at 880; *Potts*, 392 S.W.3d at 630.

**B.    Plaintiffs' reports establish the manner in which Harlingen Medical Center breached the relevant standard of care.**

Next, Mr. Felty provided a fair summary of the breaches of the standard of care by Harlingen Medical Center—*i.e.,* what care was expected but not given to Mr. Andrade.[8] *See Palacios*, 46 S.W.3d at 880. In his report, Mr. Felty detailed how the nursing care managers, nursing supervisors, and nursing staff, specifically Heather Smith, Debbie Mendoza, Terri Wood, and Maria Torres, breached the standard of care that was due to Andrade.

Ultimately, Mr. Felty opined that case management failed to appropriately, and within the standard of care, carry out the physician

---

[8] Harlingen Medical Center does not challenge Mr. Felty's report regarding breach either.

21

transfer order of an emergency condition on December 19, 20, 21, and 22. (2 CR 364).

> **i.** **Case management failed to effectuate the transfer order by failing to obtain a physician-to-physician call and by failing to provide all relevant information to potential transfer facilities. (2 CR 364).**

Nurse Smith only contacted one facility on December 19 and failed to provide or obtain the appropriate patient data, including the proper diagnosis of an *ascending* or Type 1 aortic dissection requiring emergency surgery. (2 CR 364). There was no consult in the chart indicating the proper diagnosis and there is no record that Nurse Smith contacted any physician to obtain one. *Id.* She also did not obtain a physician certification indicating whether Mr. Andrade was stable for transfer, whether he had an emergency condition, and why he was being transferred (i.e. whether he was being transferred merely due to being unfunded or because he needed a facility that could provide greater expertise). *Id.*

Mr. Felty said that it is crucial to a receiving hospital to have this information so it can evaluate whether a transfer is medically indicated or necessary and whether transfer is in the best interest of the patient. *Id.* Failure by Nurse Smith to obtain the appropriate data to communicate to the

receiving hospital, such as a physician certification, led to an incorrect diagnosis of *descending* aortic dissection being included in Dr. Desai's history and physical. *Id.*

Nurse Smith further failed to determine if Mr. Andrade's condition was emergent or non-emergent to facilitate an appropriate transfer. *Id.* Nurse Smith failed to coordinate physician-to-physician calls, which would have allowed for full communication between physicians and provided the patient with the best opportunity to transfer. *Id.* Nurse Smith also did not communicate with any physician to seek alternative orders or assistance in finding an accepting physician or hospital. *Id.* Such actions or inactions were breaches of the applicable standard of care for a nurse supervisor. *Id.* Furthermore, Nurse Smith's failure to communicate that Andrade had an emergent condition on December 19 was a breach of the standard of care. *Id.*

It was not until the following day, December 20, that Nurse Torres found a consult in Mr. Andrade's chart that indicated the correct diagnosis of an ascending aortic dissection. *Id.* Nurse Torres sent that information to Memorial Hospital, the same hospital that had denied Andrade the day before. *Id.* Tellingly, however, the receiving physician at Memorial indicated

23

that Mr. Andrade's case must not have been emergent, otherwise Harlingen Medical Center would have transferred him out "yesterday." *Id.*

On December 20, for the first time, Nurse Torres contacted a facility other than Memorial Hermann. *Id.* There is no indication that Nurse Torres facilitated a physician-to-physician call to communicate that Mr. Andrade needed more than just an open bed. (2 CR 364-65). She also contacted Methodist Hospital, but she did not facilitate a physician call or even provide a physician phone number. (2 CR 365). This led to a delay in physician communication. *Id.* Nurse Torres did not make any other calls to any other facilities and simply waited on Methodist to respond. *Id.* Only after Methodist declined the transfer did Nurse Torres then contact University Hospital. *Id.* However, again, she did not facilitate a physician-to-physician call, which led to a quick decline of transfer within 35 minutes. *Id.* Nurse Torres's failure to facilitate a physician-to-physician call for a transfer was a breach in the standard of care. *Id.* Nurse Torres notified Terri Wood, case manager, but then ceased all efforts to follow the transfer order on that day. *Id.*

Mr. Felty's report states that Nurse Torres did not attempt another transfer until approximately 16 hours later at 10:30 on December 21. *Id.*

24

However, this attempt was merely to the same hospital that had already declined Mr. Andrade the prior day. *Id.* Two hours later, that hospital declined again. *Id.* Nurse Torres did not contact an attending physician or invoke the chain of command to advise that she was unable to transfer Andrade, who was in need of emergency surgery. *Id.* After a delay of almost three hours, instead of contacting a different facility, Nurse Torres contacted Memorial Hermann for a third time, which again declined Andrade within 45 minutes. *Id.* Nurse Torres made no further efforts to coordinate an emergent transfer of Mr. Andrade. *Id.* Nurse Torres's failure to carry out the transfer order was, therefore, also a breach of the standard of care. *Id.*

ii.   **Case management failed to continually work to locate an accepting facility to care for Mr. Andrade starting on December 19, and failed to look statewide for an accepting facility. (2 CR 364-65).**

All transfer attempts were ceased each day by early evening. (2 CR 365). Nurse Smith failed to provide a shift change report and handoff to the oncoming house supervisor in order to continue the transfer order efforts. *Id.* By failing to carry out the transfer order on December 19, Nurse Smith placed Mr. Andrade's medical condition at risk for deterioration. *Id.* By calling only one or two facilities repeatedly, when numerous facilities in

Houston, Dallas, San Antonio, Corpus Christi, Galveston, Austin, and Fort Worth would have been available, Nurse Smith ensured that Mr. Andrade's healthcare needs would not be met. *Id.*

Neither Nurse Torres nor Nurse Wood continued efforts of transfer through shift change handoff reports or by contacting a physician for an alternate care plan or by contacting any other facility in Texas or the United States on December 20—despite knowing that Mr. Andrade needed emergency surgery. *Id.* Nurse Torres and Nurse Wood breached the standard of care by such failures. *Id.* Thus, during the almost 14 hours leading up to Mr. Andrade's death, neither Nurse Torres nor anyone from Harlingen Medical Center documented *any* attempts to carry out the emergent order for Mr. Andrade's transfer, depriving him of any chance of receiving the necessary surgical treatment. (2 CR 365-66).

### iii. Case management failed to follow the chain of command and escalate the inability to secure an accepting facility. (2 CR 366).

Nurse Smith did not seek assistance from any supervisor, physician, or administrator in order to attempt a transfer. (2 CR 366). This failure led to a delay in meeting Mr. Andrade's medical needs. *Id.* Although Nurse Torres advised a case manager regarding Andrade on December 20, she failed to

26

follow up to determine the next step or alternative and abandoned her efforts to follow the physician order. *Id.* This failure by Nurse Torres led to a delay in Andrade's medical care needs including emergency surgery, which is a breach of the standard of care. *Id.*

Nurse Wood and Nurse Mendoza also failed to carry out the physician emergency transfer order by failing to contact a supervisor, nurse administrator, chief nursing officer, or chief of staff to advise that a patient needing emergency surgery was not having his medical care needs met. *Id.* Nurse Torres', Nurse Smith's, Nurse Mendoza's, and Nurse Woods' failures to invoke the chain of command when a physician's emergent order could not be carried out was a violation of the applicable standard of care. *Id.*

> iv. **Case management failed to keep the physicians up to date on the inability to secure acceptance for transfer. (2 CR 366-67).**

Finally, Mr. Felty noted that case management breached the standard of care by failing to inform Mr. Andrade's physicians of case management's failures to locate a transfer facility. (2 CR 366-67). Nor did any of the nurses ever inform the physicians that they were going to stop working on the transfer order. *Id.* Meanwhile, it appears that the physicians were under the impression that transfer efforts were ongoing, when in reality the nurses

27

were not properly carrying over the transfer orders from shift to shift. *Id.*

As demonstrated above, Harlingen Medical Center breached the standard of care by failing to follow the required steps to transfer Mr. Andrade, a patient with an emergent medical condition who Harlingen Medical Center's physicians refused to operate on. Mr. Felty's report meticulously detailed what care was expected, but not given to Mr. Andrade. This certainly constituted a "fair summary" and was sufficient under § 74.351. *See Palacios*, 46 S.W.3d at 880.

## C. Plaintiffs' expert reports causally link Harlingen Medical Center's breach of the standard of care to Mr. Andrade's death.

With the exception of a few related issues, Harlingen Medical Center's appeal only challenges Dr. Adams' and Dr. DeBehnke's reports regarding causation. However, because Plaintiffs' reports meet the minimum requirements for causation under Chapter 74, the trial court did not abuse its discretion in denying Harlingen Medical Center's motions to dismiss.

Section 74.351 requires experts to provide a "fair summary of the expert's opinions" regarding "the causal relationship between [the failure to meet the applicable standards of care] and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). Generally, "[a] causal

relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omissions, the harm would not have occurred." *Cornejo*, 446 S.W.3d at 123 (citing *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.)). In other words, Plaintiffs "must present evidence 'that it is *more likely than not* that the ultimate harm or condition resulted from such negligence.'" *Patterson v. Ortiz*, 412 S.W.3d 833, 836 (Tex. App.—Dallas 2013, no pet.) (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 532-33 (Tex. 2010)) (emphasis added).

While a plaintiff's expert reports must establish a causal connection beyond mere conjecture or possibility, a "'fair summary' is something less than all of the evidence necessary to establish causation at trial." *Hutchinson*, 144 S.W.3d at 617-18 (citing *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970); *Wright*, 79 S.W.3d at 52). Furthermore,

> [a]n expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *The expert must simply provide some basis that a defendant's act or omission proximately caused injury. And the expert must explain the basis of his statements and link his conclusions to the facts.*

*Cornejo*, 446 S.W.3d at 123 (emphasis added) (citing *Wright*, 79 S.W.3d at 52-

29

53; *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.)).

Plaintiffs provided reports from Dr. Adams and Dr. DeBehnke to demonstrate how Harlingen Medical Center's negligence contributed to cause Mr. Andrade's death. Harlingen Medical Center argues that Plaintiffs' reports were insufficient on causation because they "were impermissibly conclusory and speculative." Appellant's Br. at x, 11. However, Plaintiffs' expert reports collectively provide a "fair summary" of the causal connection between Harlingen Medical Center's negligence and Mr. Andrade's death and, therefore, fulfil the requirements of § 74.351.[9]

---

[9] In a separate issue, Harlingen Medical Center also argues that Mr. Cross and Mr. Felty were disqualified from opining on causation because neither of them are physicians. Appellant's Br. at 19-20. The Court should overrule this issue. First, neither Cross nor Felty needed to provide the causation opinion required by § 74.351 because causation was covered by Dr. Adams and Dr. DeBehnke, who are both qualified physicians. *See Abilene Reg'l Med. Ctr. v. Allen*, 387 S.W.3d 914, 918 (Tex. App.—Eastland 2012, pet. denied) (citing Tex. Civ. Prac. & Rem. Code § 74.351(i)) ("a plaintiff may serve multiple reports by separate experts regarding different defendants, different claims, and different issues, as long as the reports, read together, provide a fair summary of the standard of care, breach, and causation."). Furthermore, Mr. Cross did not offer any opinion on causation. And while the last sentence of Mr. Felty's report states, "If the nurses had complied with the standard of care, in reasonable probability, Andrade would have been placed and would have received the surgery he needed," the trial court acted within its discretion to disregard that sentence and deny the Harlingen Medical Center's Second Motion to Dismiss, because Plaintiffs' collective reports otherwise satisfied the requirements of § 74.351. (2 CR 247-48, 367). Additionally, to the extent that Mr. Felty's attempted causation opinion is merely an opinion relating to the administrative functions of Harlingen Medical Center and case management, rather than a medical diagnosis or medical cause of death, Mr. Felty is arguably qualified to offer such an opinion.

### i. Dr. Adams and Dr. DeBehnke sufficiently established causation.

Dr. Adams and Dr. DeBehnke each linked the breaches of the standard of care committed by Harlingen Medical Center's case management team to Mr. Andrade's death. (1 CR 242-43, 265-66).

In his report, Dr. Adams stated that Mr. Andrade's dissection was treatable through emergency cardiovascular surgery and that Mr. Andrade's aortic rupture ultimately occurred due to a lack of surgical intervention and timely care. (1 CR 243). Further, Dr. Adams specifically explained that patients with conditions and comorbidities like Mr. Andrade who receive immediate medical treatment with a beta blockade while undergoing preparation for cardiovascular surgery to repair a dissection have superior outcomes, and that Mr. Andrade's dissection, in reasonable medical probability, would have likely been halted and repaired. (1 CR 242). Dr. Adams stated that delays in the necessary treatment for this type of disease process, however, can result in death. (1 CR 241). Similarly, Dr. DeBehnke stated that an ascending aortic dissection is a medical emergency and that the consequence for failing to immediately treat the condition is ultimately death. (1 CR 265). Time was of the essence and Harlingen Medical Center

and its staff failed to ensure an emergent transfer by not requiring a physician-to-physician call or a documented consult of Andrade's condition. (1 CR 242). Dr. Adams further explained that transfer communication for this type of disease process should be physician-to-physician between the sending and receiving hospitals and should never be left solely to case management personnel. (1 CR 243).

Dr. Adams then stated that "Harlingen Medical Center and its staff's delay and failure to provide and arrange for providing immediate surgery within the capabilities of the hospital and medical staff, arranging for an emergent and proper transfer of Mr. Andrade to a tertiary center as ordered by physicians as outlined above and in a timely manner resulted in progression of the dissection, with the known complication of rupture and death." (1 CR 242). The failures of the case management team to provide and arrange for an emergent and proper transfer as ordered by physicians resulted in the progression of Mr. Andrade's aortic dissection and ultimate death. *Id.* Basing his opinions on a reasonable medical probability, Dr. Adams ultimately opined:

> [I]f the case management staff had not breached the applicable standard of care on December 19th, 20th, 21st, and 22nd, Mr. Andrade's condition would not have led to a subsequent

ruptured aorta and death. It is my further opinion that their negligence in delay of diagnosis and substandard care as outlined above was a proximate cause of his progressive deterioration, free aortic rupture and death.

(1 CR 242).

Dr. DeBehnke's report echoed Dr. Adams' report, stating that Harlingen Medical Center's case management team denied Mr. Andrade the opportunity to receive emergency surgical treatment at another facility in a timely manner by failing to complete two separate transfer orders through the various breaches in the standard of care. (1 CR 265). The negligence of the case management team contributed to cause Mr. Andrade's death because these acts and omissions in breach of the standard of care resulted in a complete failure of treatment for three days, at the end of which Mr. Andrade's aorta ruptured and he died. *Id.* Dr. DeBehnke stated that Harlingen Medical Center's delays adversely affected Mr. Andrade's condition and were a proximate cause of a downward clinical spiral in his condition, which resulted in his death. (1 CR 265-66).

Therefore, Dr. Adams and Dr. DeBehnke provided a "fair summary" of the causal connection between Harlingen Medical Center's breach of the standard of care in failing to transfer Mr. Andrade and Mr. Andrade's death

33

due to lack of surgical intervention. *See Potts*, 392 S.W.3d at 630; *Palacios*, 46 S.W.3d at 880. Collectively, their reports (1) inform Harlingen Medical Center of the specific conduct that Plaintiffs have called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Potts*, 392 S.W.3d at 630. The requirements of § 74.351 are plainly met for at least one theory against Harlingen Medical Center. Accordingly, the trial court did not abuse its discretion in denying Harlingen Medical Center's motions to dismiss. *See Potts*, 392 S.W.3d at 631.

ii. **Harlingen Medical Center incorrectly argues that Plaintiffs must conclusively establish causation.**

Harlingen Medical Center's real problem with the Andrades' expert reports is that they do not identify a *specific* hospital that would have accepted Mr. Andrade. *See* Appellant's Br. at 11-12. According to Harlingen Medical Center, "Appellees' case depends on an adequate hospital and a qualified surgeon being willing to accept Andrade as a patient despite his lack of financial resources." *Id.* at 12. Thus, according to Harlingen Medical Center, "[t]o prove causation, [Plaintiffs] must identify such a hospital with such a surgeon, and explain how compliance by HMC with the standard of care for transfers would have gotten Andrade into such a hospital." *Id.* at 8.

34

However, this argument is incorrect and improperly places a much higher burden on Plaintiffs than Chapter 74 requires.

### 1. Chapter 74 does not require Plaintiffs to conclusively establish causation.

Section 74.351 does not require Plaintiffs to conclusively establish causation, as Harlingen Medical Center's argument suggests—nor do any of the cases cited in Harlingen Medical Center's brief support this proposition. At this stage in litigation, the law does not require Plaintiffs to marshal all of their proof or to provide all of the evidence that would be necessary to establish causation at trial, so it certainly does not require Plaintiffs to conclusively establish causation. *See Lenger*, 455 S.W.2d at 706; *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879; *Hutchinson*, 144 S.W.3d at 617-18. Even at trial, plaintiffs only must present evidence that it is "more likely than not" that the ultimate harm resulted from the defendant's negligence.[10]

Here, Plaintiffs need only provide a "fair summary" of causation, and the reports of Drs. Adams and DeBehnke did just that. *See* Tex. Civ. Prac. &

---

[10] *See Patterson*, 412 S.W.3d at 836 ("Causation is established in medical malpractice cases through evidence of a 'reasonable medical probability' or 'reasonable probability' that the injuries were caused by the defendant's negligence; in other words, the plaintiff must present evidence that it is more likely than not that the ultimate harm or condition resulted from such negligence.") (internal citations omitted).

Rem. Code § 74.351 (r)(6). Furthermore, Plaintiffs' experts make clear that it was not merely Harlingen Medical Center's failure to continually work to effectuate the transfer that led to Mr. Andrade's death. Plaintiffs do not simply argue that if Harlingen Medical Center had called more facilities, Mr. Andrade would have lived. Rather, Plaintiffs' experts also note that of the handful of other hospitals the case management team even bothered to contact, the information that the team was communicating about Mr. Andrade and his level of need for a transfer was *incorrect* and *missing critical pieces*. Thus, not only did case management only contact four hospitals and cease all transfer efforts at 4:00-6:00 pm each day, but even when they were trying to transfer Andrade, they failed to provide potential facilities with the right information in the proper format.

Harlingen Medical Center argues that it could not find any place that would accept Mr. Andrade and that Plaintiffs' claim must fail absent evidence of a specific hospital that would have taken him. However, while Plaintiffs' experts do not identify a specific hospital by name, they state that had Harlingen Medical Center provided potential accepting facilities with the correct diagnosis, the correct information about Mr. Andrade's condition, and the proper physician-to-physician communication, the other

36

facilities would have known that this was an emergency transfer situation—not a non-emergent situation or a situation where Harlingen Medical Center wanted to transfer Mr. Andrade out simply because he was unfunded. Plaintiffs' experts say this was crucial information and would have made a difference.

Additionally, had the case management team communicated with Mr. Andrade's physicians regarding the difficulties they were encountering in transferring him, those physicians could have assisted in the search or further adjusted Mr. Andrade's care plan. Instead, absent proper communication from the case management team, it appears that the physicians believed that a successful transfer was pending. Further, had the case management nurses instituted the chain of command when Mr. Andrade's needs were not being met, other hospital administrators such as Harlingen Medical Center's CEO, Chief of Medical Staff, or Chief of Cardiothoracic Surgery could have stepped in and assisted.

In any event, Plaintiffs were not required to prove what specific hospital would have accepted Mr. Andrade, how he would have paid, or exactly how he would have gotten there. Rather, Plaintiffs were only required to provide Harlingen Medical Center and the trial court with some

basis that Harlingen Medical Center's acts or omissions proximately caused Plaintiffs' injuries, which they did. *See Cornejo*, 446 S.W.3d at 123; *Wright*, 79 S.W.3d at 52-53; *Fortner*, 399 S.W.3d at 383. As discovery is conducted, new information regarding the specific hospitals that would have been available to accept Mr. Andrade may be learned, however, the question here is whether Plaintiffs' expert reports represent a "good faith effort to comply with the statutory requirements"—nothing more. *See Schrapps v. Lam Pham*, No. 09-12-00080-CV, 2012 WL 4017768, at *4 (Tex. App.—Beaumont Sept. 13, 2012, pet. denied) (mem. op.) ("As discovery is conducted, new information regarding the perforation, and when it occurred, may be learned. The question at this stage is not one of summary judgment, but whether the report represents a good faith effort to comply with the statutory requirements.").

> **2. Chapter 74 does not require Plaintiffs to respond to or negate Harlingen Medical Center's potential defenses.**

By arguing that Plaintiffs can only survive a motion to dismiss for insufficient expert reports by proving that a specific hospital would have accepted Andrade, Harlingen Medical Center attempts to redefine Plaintiffs' burden under Chapter 74 to include an extra requirement of anticipating and

rebutting all possible defensive theories that may ultimately be presented to the trial court.

Harlingen Medical Center's argument focuses entirely on the availability (or unavailability) of third party hospitals and essentially boils down to this: even if Harlingen Medical Center had done everything required by the standard of care, Mr. Andrade probably still would have died because no hospital would have accepted him. In other words, Harlingen Medical Center blames Mr. Andrade's death on the potential unavailability of a third party hospital willing to accept transfer. This is a new and independent cause argument.[11] The existence of a new and independent cause is an inferential rebuttal defense, which operates to rebut the element of proximate cause of a plaintiff's case.[12] Defendants raise an inferential rebuttal defense any time they "blame an occurrence on someone

---

[11] "A new and independent cause of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009).

[12] *See, e.g.*, *Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429, 430 (Tex. 2005) ("An inferential rebuttal defense operates to rebut an essential element of the plaintiff's case by proof of other facts. For example, the defendants in this case contended at trial that the fatal auto accident in issue was not caused by their negligence, but rather by the presence of cattle on the roadway or by the conduct of the cattle's owner who allowed them to be there."); *see also Thota v. Young*, 366 S.W.3d 678, 692-93 (Tex. 2012).

or something other than themselves." *Dillard v. Tex. Elec. Co-op.*, 157 S.W.3d 429, 432 (Tex. 2005). But Chapter 74 does not require Plaintiffs to respond to or negate inferential rebuttal defenses in their expert reports.

First, requiring a court to evaluate inferential rebuttal defenses during the preliminary expert report stage would violate the "four corners" rule. A trial court is required to evaluate a health care liability plaintiff's expert reports based only on the "four corners" of the document. *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If the trial court is able to determine the basis of the plaintiff's complaint from the four corners of the report, it is adequate under Chapter 74. *See In re Stacy K. Boone*, 223 S.W.3d 398, 406 (Tex. App.—Amarillo 2006, orig. proceeding) (Noting that "[w]hile [defendants] may disagree with [an expert's] opinions," a report that contains a fair summary of the expert's opinions is sufficient under Chapter 74). Plaintiffs' expert reports provide a fair summary of the experts' opinions that had Harlingen Medical Center complied with the standard of care, *more likely than not* Mr. Andrade would have been transferred and would have received the emergency treatment necessary for him to survive.

More importantly, Chapter 74 does not require health care liability

plaintiffs to "anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court." *Cornejo*, 446 S.W.3d at 123; *see also Fortner*, 399 S.W.3d at 383. Nor does it require plaintiffs to exclude all other possible causes of their injuries. *See Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.) ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed."). Where an expert report provides a fair summary of the expert's opinions, informs the defendant of the specific conduct the plaintiff questions, and provides a basis for the trial court to conclude that the plaintiff's claims have merit, it is adequate, whether or not it addresses every causation issue that a defendant may raise in a challenge. *See, e.g., Whitfield v. Henson*, 385 S.W.3d 708 (Tex. App.—Dallas 2012, no pet).

> **3.** **Case law cited by Harlingen Medical Center does not support its claim that Plaintiffs must prove that a specific hospital would have accepted Mr. Andrade.**

Harlingen Medical Center cites several cases that it claims support the

argument that Plaintiffs' experts were deficient.[13] However, each of those cases are distinguishable from the facts of this case—and none of them state specifically that in negligent failure to transfer cases a plaintiff must identify a specific hospital or doctor who would have accepted the plaintiff, or even remotely require the level of proof that Harlingen Medical Center demands here.

*Estorque v. Schafer* is a failure to consult case. In *Estorque*, the expert stated that the treating physicians should have obtained a urological consultation, a gynecological consultation, and/or referrals in order to obtain definitive care and treatment of the patient's ureteral obstruction and ovarian mass. *Estorque*, 302 S.W.3d at 28. Then, without any further explanation, the expert concluded that the treating physicians' "'failure to practice according to acceptable standards, more likely than not and to a reasonable degree of medical probability, resulted in loss of function of [the patient]'s kidney' and 'resulted in needless pain and suffering to [the patient].'" *Id.* The court held that the report was insufficient because it

---

[13] *See* Appellant's Br. at 16-19 (citing *Estorque v. Schafer*, 302 S.W.3d 19 (Tex. App.—Fort Worth 2009, no pet.); *Jones v. King*, 255 S.W.3d 156 (Tex. App.—San Antonio 2008, pet. denied); *Tenet Hosp. Ltd. v. Love*, 347 S.W.3d 743, 755 (Tex. App.—El Paso 2011, no pet.); and *Schrapps v. Lam Pham*, No. 09-12-00080-CV, 2012 WL 4017768).

"leaves gaps by not explaining how or why the physicians' failure to consult a urologist or gynecologist caused worsening or progression of [the patient]'s listed conditions." *Id.*

Notably, however, the court did not state that the report was insufficient because it failed to name the specific doctors who could have and would have performed the necessary urological and gynecological consults. If Harlingen Medical Center is correct that the Andrades' expert reports were required to identify a specific hospital that would have accepted Mr. Andrade, then that same rule would require a plaintiff in any failure to consult case like *Estorque* to conclusively establish that a particular specialist capable and willing to perform the necessary consult would have been available and able to get to the patient on that particular date. No Texas cases require such evidence from a health care liability plaintiff at the expert report stage—if ever.

Rather, the *Estorque* court merely held that the report failed to explain fully *how* the physicians' inaction caused the plaintiff's injuries. *Id.* at 29. However, Plaintiffs' reports do not suffer from this defect here, since Doctors Adams and DeBehnke sufficiently explained how the case management team's inaction caused Mr. Andrade's death.

43

Doctors Adams and DeBehnke each identified the specific treatment for a Type 1 ascending aortic dissection that Mr. Andrade needed to avoid the known consequences of rupture and death.[14] Since the physicians at Harlingen Medical Center were not going to provide that treatment, Andrade needed to be transferred. Harlingen Medical Center tried, but failed, and Mr. Felty's report details the standard of care required of Harlingen Medical Center once a transfer order is placed and how the its staff woefully failed to comply with that standard.

In *Jones v. King*, the expert report stated that a delay in diagnosing the plaintiff's meningitis for 48 hours caused it to become much worse, resulting in increased pain and suffering of the plaintiff. *Jones*, 255 S.W.3d at 159. The San Antonio Court of Appeals held that the report "wholly fails to explain how these alleged breaches caused the injuries alleged . . . ." *Id.* The expert failed "to link any delay in diagnosis to any additional pain and suffering or exacerbation of the meningitis than what would have occurred in the face of an earlier diagnosis." *Id.* at 159-60. Essentially, the expert "[did] not attempt

---

[14] "Those patients, like Mr. Andrade and his comorbidities, who receive immediate medical treatment with beta blockade while undergoing timely preparation for cardiovascular surgical intervention have superior and better outcomes as this dissection in reasonable medical probability, will more likely than not, be halted and repaired." (1 CR 242).

to explain how these results would not have occurred if the diagnosis of meningitis had occurred 48 hours earlier," nor did the expert offer any "*medical explanation* about whether earlier treatment would have been effective in shortening the duration of the meningitis, precluding additional pain and suffering, or preventing other alleged injuries and damages." *Id.* (emphasis added).

Harlingen Medical Center attempts to liken the facts of *Jones* to this case, arguing that "[i]n our case, plaintiffs' experts say Andrade needed a transfer and criticize HMC's efforts to accomplish the transfer, but they do not say how better efforts would have resulted in a successful transfer." Appellant's Br. at 18. However, Plaintiffs' experts do explain what better efforts were required, that more likely than not those efforts would have resulted in a successful transfer, and they provide a medical explanation that without transfer, Andrade was deprived of the emergency surgery that more likely than not would have saved him.

Furthermore, Plaintiffs' reports are nothing like the overbroad and conclusory report in *Tenet Hospitals*. There, "[t]he only specific breach that [the expert] mentioned in support of causation against the hospital claimed that if [the hospital] 'had a pulmonologist or critical care specialist on call

and available to see and treat this patient or had transferred this patient before her condition worsened, [the patient] would more likely than not be alive today,' . . . ." *Tenet Hosp. Ltd.*, 347 S.W.3d at 755. The court said that "such a broad statement does not set out specifically the causal relationship between the hospital's conduct and [the patient]'s death. [The expert] provided no analysis of how [the hospital] should have made a physician available for a consult with other physicians, how either of those consults would have saved [the patient]'s life, or how the hospital could have effectuated the transfer separate and apart from Dr. Pallares." *Id.* In short, by opining, *inter alia*, that if the plaintiff had been transferred, "[she] would not have died, [the expert] simply expressed an inference without stating the underlying facts upon which that inference was based. Thus, the statement is conclusory. It is without any medical explanation about whether a consult or transfer would have resulted in care and treatment, or a different outcome." *Id.*

Here, Plaintiffs' experts do not offer a bare assertion that "had Andrade been transferred, he would have lived" or "had Harlingen Medical Center tried harder he would have lived." Rather, the reports collectively explained *how* the hospital should have gone about transferring Andrade,

46

and how its failure to follow those standards directly led to his death.

Finally, Harlingen Medical Center argues that the expert report in *Schrapps v. Pham* "demonstrates what a sufficient expert report in a transfer case looks like." Appellant's Br. at 18. Harlingen Medical Center says that *Schrapps* has the crucial link that is missing in our case: the expert in *Schrapps* identified a specific hospital that would accept the transfer. *Id.* (citing *Schrapps*, 2012 WL 4017768, at *6-7). However, Harlingen Medical Center fails to explain that the facts in *Schrapps* are distinguishable from the facts here. Namely, *Schrapps* is a case where, unlike here, the plaintiff was successfully transferred to an accepting hospital, but the transfer was simply too late and the patient died anyway. *Schrapps*, 2012 WL 4017768, at *1. Thus, in *Schrapps* there was no issue as to whether any hospital would have accepted the plaintiff because a hospital ultimately did. Here, Mr. Andrade died before Harlingen Medical Center could transfer him anywhere. Harlingen Medical Center knew he needed to be transferred, but failed to do what it needed to do to transfer him.

Plaintiffs' experts provided a "fair summary" of the causal links between the Hospital's breaches of the relevant standards of care and Mr. Andrade's death. The experts provided opinions on the causes of Mr.

47

Andrade's death and sufficiently linked their conclusions to the facts. Accordingly, the trial court did not abuse its discretion in denying Harlingen Medical Center's motions to dismiss.

**IV.  The Court need not address Harlingen Medical Center's argument that it cannot be blamed for Dr. Lopez' decision not to perform Mr. Andrade's surgery.**

In its last issue, but again without ever arguing that the trial court abused its discretion, Harlingen Medical Center argues that it cannot be blamed for Dr. Lopez's decision not to perform surgery on Mr. Andrade. *See* Appellant's Br. at xi, 20. According to Harlingen Medical Center, Plaintiffs' experts "suggest HMC was negligent for not seeing to it that surgery was performed on Andrade at HMC." *Id.* at 20. Harlingen Medical Center claims that Plaintiffs' experts failed to show (1) how the standard of care could require Harlingen Medical Center to provide surgery, when physicians at private hospitals in Texas are independent contractors and not under the control of the hospital; and (2) that Harlingen Medical Center and its doctors were capable of providing the surgery Andrade needed. *Id.* at 20-22. The Court should overrule this issue.

First, this Court need not address this issue. Plaintiffs provided expert reports that demonstrate at least one viable theory against Harlingen

Medical Center, which fully satisfies the requirements of § 74.351. In *Certified EMS, Inc. v. Potts*, the Texas Supreme Court held that "[i]f a health care liability claim contains at least one viable theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous." *Potts*, 392 S.W.3d at 631. Once a health care liability claimant clears this "first hurdle," she has a "right to have the entire case move forward." *Id.* Here, Plaintiffs' expert reports demonstrate a viable theory of liability against Harlingen Medical Center for its negligent failure to transfer Mr. Andrade to another facility. Therefore, Plaintiffs have the right to have their case move forward.

Second, Harlingen Medical Center mischaracterizes the reports of Plaintiffs' experts with regard to this issue. Neither Plaintiffs, nor their experts, claim that Harlingen Medical Center should have forced Dr. Lopez or any other doctor to perform surgery on Mr. Andrade. Rather, Plaintiffs' experts opine that the standard of care required that Harlingen Medical Center have physicians on staff capable of performing the surgery, but if those physicians could not or would not, then Harlingen Medical Center was required to transfer Mr. Andrade to another facility that would provide the treatment he needed to survive. Indeed, Dr. DeBehnke's report states that

"[a] reasonable and prudent hospital that advertises its cardiothoracic surgical services and has on staff a qualified cardiothoracic surgeon is required to provide definitive surgical care to a patient such as Mr. Andrade unless it is deemed beyond the capabilities of the organization and/or the staff. Furthermore, the reasonable and prudent hospital is required through its medical staff agents to provide appropriate and expedient transfer to another facility when unable to perform the services." (1 CR 263).

Dr. DeBehnke's opinion is underscored by the fact that Harlingen Medical Center holds itself out to the community as having expertise in cardiac care and cardiothoracic surgery. (1 CR 262). While it may be true, as Harlingen Medical Center says, that "each patient is different and presents his own set of complications and comorbidities," a hospital that holds itself out to the public for its cardiothoracic surgical services should have physicians on staff capable of performing those services, and in the event that its physicians are not capable of performing an emergency surgery, should arrange for an emergent and proper transfer of the patient. (*See* 1 CR 242, 263).

As Harlingen Medical Center states in its brief, "[b]oth experts acknowledge that cardiovascular surgeon Dr. Ruben Lopez was consulted,

50

and Dr. Lopez decided not to take Andrade into surgery himself but rather that Andrade should be transferred." Appellant's Br. at 20. Therefore, once the order of transfer was made, the standard of care required Harlingen Medical Center's case management team to arrange for emergent transfer of Mr. Andrade to a medical facility capable of performing the aortic surgery he required. Harlingen Medical Center has not shown that the trial court abused its discretion in any way.

## V. If the Court finds that Plaintiffs' initial reports are insufficient regarding causation, Plaintiffs are entitled to a 30-day extension to cure that deficiency.

Finally, Harlingen Medical Center argues that if this Court finds that Plaintiffs' expert reports are insufficient, "the proper remedy is to remand with instructions to dismiss the claims against HMC with prejudice to refiling." Appellant's Br. at 23. Harlingen Medical Center claims that Plaintiffs would not be entitled to another 30-day extension to cure because they have already had one extension. *Id.* According to Harlingen Medical Center, this is because a plaintiff who was granted an extension "was on notice of *all potential deficiencies* in the expert report and acted at her own risk in failing to remedy those alleged deficiencies." *Id.* (emphasis added).

Harlingen Medical Center is incorrect. The trial court granted Plaintiffs

51

the 30-day extension for the express purpose of curing deficiencies concerning qualifications of Plaintiffs' experts regarding standard of care and breach, but otherwise found the reports sufficient regarding causation.[15] Therefore, Plaintiffs have never been on notice of any deficiencies in their opinions concerning causation.

Furthermore, "[t]he Texas Supreme Court has held that when the court of appeals reverses a trial court's determination that an expert report is sufficient, the appropriate remedy is for the court of appeals to remand to the trial court to consider whether to grant a thirty-day extension." *Renaissance Surgical Ctrs.-S. Tex., L.L.P. v. Jimenez*, No. 13-07-121-CV, 2008 WL 3971096, at *11 (Tex. App.—Corpus Christi Aug. 28, 2008, no pet.) (mem. op.) (citing *Leland v. Brandal*, 257 S.W.3d 204, 207-08 (Tex. 2008)).

Therefore, if this Court determines that the trial court abused its discretion in finding Plaintiffs' initial reports sufficient on causation, the Court should remand to the trial court with instructions to determine whether to grant Plaintiffs a 30-day extension to remedy that specific

---

[15] *See* 1 CR 300 ("Plaintiffs are hereby granted a 30-day extension from the date of this order to serve on HMC a supplemental expert report from an expert qualified to render an opinion concerning the applicable standard of care for Harlingen Medical Center and whether that standard of care was breached. Otherwise, Harlingen Medical Center's Motion to Dismiss for Insufficient Expert Reports is DENIED.").

deficiency. Because Plaintiffs have never been on notice of any deficiencies regarding causation, and the trial court previously found that Plaintiffs' reports were sufficient regarding causation, Plaintiffs would be entitled to an additional 30-day extension to cure. *See* Tex. Civ. Prac. & Rem. Code § 74.351(c); *Renaissance Surgical*, No. 13-07-121-CV, 2008 WL 3971096, at *11.

## VI. Conclusion

The purpose of Chapter 74 of the Texas Civil Practice and Remedies Code is to "deter baseless claims, not block earnest ones." *Potts*, 392 S.W.3d at 631. Accordingly, to meet the requirements of Chapter 74 and survive a motion to dismiss, a health care liability plaintiff need only make a "good faith effort" to provide a fair summary of the applicable standards of care, the manner in which the provider failed to meet the standards, and the causal relationship between that failure and the harm claimed.

Harlingen Medical Center seeks to require Plaintiffs to conclusively establish causation and to anticipate and rebut all possible defensive theories—a burden that is never required at this stage of litigation. However, Plaintiffs have more than made a good faith effort to comply with Chapter 74. Plaintiffs provided reports from qualified experts that collectively (1) put Harlingen Medical Center on notice of the specific conduct complained of

53

and (2) provided the trial court a basis on which to conclude that the claims have merit. *See Otero*, 319 S.W.3d at 199.

Accordingly, the trial court did not abuse its discretion in denying Harlingen Medical Center's motions to dismiss. Plaintiffs respectfully request that this Court affirm the trial court's rulings. However, if this Court determines that Plaintiffs' reports are insufficient regarding causation, Plaintiffs request that this Court remand this case to the trial court with instructions to determine whether a second 30-day extension should be granted to cure the reports of that specific defect. Plaintiffs further request any other relief to which they may be entitled under law or equity.

Respectfully submitted,

By: */s/ Morgan A. McPheeters*
**F. Leighton Durham, III**
State Bar No. 24012569
ldurham@texasappeals.com
**Kirk L. Pittard**
State Bar No. 24010313
kpittard@texasappeals.com
**Morgan A. McPheeters**
State Bar No. 24081279
mmcpheeters@texasappeals.com
KELLY, DURHAM & PITTARD, LLP
PO Box 224626
Dallas, TX 75222
(214) 946-8000 (Telephone)
(214) 946-8433 (Facsimile)

**COUNSEL FOR APPELLEES**

AND

**Laura E. Gutierrez Tamez**
State Bar No. 00793869
lrtamez@herreralaw.com
**Jorge A. Herrera**
State Bar No. 24044242
jherrera@herreralaw.com
THE HERRERA LAW FIRM, INC.
111 Soledad Street, Suite I 900
San Antonio, Texas 78205
(210) 224-1054 (Telephone)
(210) 228-0887 (Facsimile)

**CO-COUNSEL FOR APPELLEES**

55

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Rule 9.4(i)(2)(B) because it contains **10,930** words, excluding any parts exempted by Rule 9.4(i)(1).

/s/ Morgan A. McPheeters
MORGAN A. MCPHEETERS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Appellees' Brief* was served on all counsel of record in accordance with the Texas Rules of Civil Procedure.

Mr. Scott T. Clark
sclark@adamsgraham.com
Mr. Roger W. Hughes
rhughes@adamsgraham.com
ADAMS & GRAHAM, L.L.P.
P. O. Drawer 1429
Harlingen, TX 78551-1429

/s/ Morgan A. McPheeters
MORGAN A. MCPHEETERS